# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

BERNARD MIMS,

*Plaintiff-Appellant,*

v.

CITY OF CHICAGO et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, No. 1:18-CV-07192
Hon. Steven Seeger

## OPENING BRIEF AND REQUIRED SHORT APPENDIX FOR PLAINTIFF-APPELLANT

Jennifer Blagg
Blagg Law
1509 W. Berwyn Ave.
Suite 201E
Chicago, IL 60640
773-859-0081
jennifer@blaggglaw.net

Jon Loevy
Rosalind Dillon
LOEVY + LOEVY
311 N. Aberdeen St., Fl. 3
Chicago, IL 60607
312-243-5900
dillon@loevy.com

*Counsel for Plaintiff-Appellant* Bernard Mims

**ORAL ARGUMENT REQUESTED**

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, counsel for Plaintiff-Appellant states as follows:

1.    The full name of every party that the undersigned attorneys represented in this case is: Bernard Mims.

2.    The names of all law firms and the partners and associates that appeared for the party now represented by us in the trial court or are expected to appear in this Court are: Jon Loevy; Rosalind Dillon; LOEVY & LOEVY, 311 North Aberdeen St., 3rd Floor, Chicago, Illinois 60607; Jennifer Blagg, Blagg Law, 1509 W. Berwyn, Suite 201E, Chicago, IL 60640.

3.    The parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by the attorneys: N/A.


RESPECTFULLY SUBMITTED,


s/ Jon Loevy
*Counsel of Record for Plaintiff-Appellant*

Jon Loevy *
Rosalind Dillon

LOEVY & LOEVY
311 N. Aberdeen St., 3rd FL
Chicago, IL 60607
(312) 243-5900

* Counsel of Record

Jennifer Blagg
Blagg Law
1509 W. Berwyn, Suite 201E
Chicago, IL 60640
(773) 859-0081

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, counsel for Plaintiff-Appellant states as follows:

1.      The full name of every party that the undersigned attorneys represented in this case is: Bernard Mims.

2.      The names of all law firms and the partners and associates that appeared for the party now represented by us in the trial court or are expected to appear in this Court are: Jon Loevy; Rosalind Dillon; LOEVY & LOEVY, 311 North Aberdeen St., 3rd Floor, Chicago, Illinois 60607; Jennifer Blagg, Blagg Law, 1509 W. Berwyn, Suite 201E, Chicago, IL 60640.

3.      The parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by the attorneys: N/A.


RESPECTFULLY SUBMITTED,


s/ Jennifer Blagg
Jennifer Blagg
Blagg Law
1509 W. Berwyn, Suite 201E
Chicago, IL 60640
(773) 859-0081

Jon Loevy *
Rosalind Dillon

LOEVY & LOEVY
311 N. Aberdeen St., 3rd FL
Chicago, IL 60607
(312) 243-5900

* Counsel of Record

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ii

INTRODUCTION ......................................................................................1

JURISDICTIONAL STATEMENT ...............................................................3

STATEMENT REGARDING ORAL ARGUMENT ......................................4

STATEMENT OF ISSUES ...........................................................................4

STATEMENT OF CASE ..............................................................................5

I.      Factual Background...........................................................................5

II.     Procedural Background ....................................................................13

SUMMARY OF ARGUMENT....................................................................16

STANDARD OF REVIEW .........................................................................17

ARGUMENT..............................................................................................18

I.      Defendants Withheld *Brady* Evidence From Mims...........................18

        A.      The Information Contained On The Suppressed Audio
                Recording Was Exculpatory and Material. ...............................18

        B.      Defendant Officers, Not The Prosecutor, Suppressed The
                Audio Recording.......................................................................26

II.     Defendants Are Not Entitled To Qualified Immunity. .......................29

CONCLUSION...........................................................................................31

CERTIFICATE OF COMPLIANCE ...........................................................32

STATEMENT CONCERNING THE APPENDIX ......................................33

REQUIRED SHORT APPENDIX ...............................................................34

## TABLE OF AUTHORITIES

*Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019)...................................18

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015) .............................................18

*Bowen v. Maynard*, 799 F.2d 593 (10th Cir. 1986).................................................23

*Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001)........................................................19

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................................13

*Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451 (7th Cir. 2020) ................17

*Engel v. Buchan*, 710 F.3d 698 (7th Cir. 2013) .......................................................30

*Gonzalez v. City of Elgin*, 578 F.3d 526 (7th Cir. 2009) .........................................29

*Goudy v. Basinger*, 604 F. 3d 394 (7th Cir. 2010) ..................................................18

*Goudy v. Cummings*, 922 F.3d 834 (7th Cir. 2019)..................................................20

*Hope v. Pelzer*, 536 U.S. 730 (2002) .......................................................................30

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ..........................................22

*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................................20, 22

*Leister v. Kloth*, 933 F.3d 696 (7th Cir. 2019)........................................................30

*Manning v. Miller*, 355 F.3d 1028 (7th Cir. 2004) ..................................................30

*Pearson v. Callahan*, 555 U.S. 223 (2009)..............................................................29

*Smith v. Cain,* 565 U.S. 73 (2012) ...........................................................................22

*Steidl v. Fermon*, 494 F. 3d 623 (7th Cir. 2007)......................................................30

*Tolan v. Cotton*, 572 U.S. 650 (2014).......................................................................17

*United States v. Agurs*, 427 U.S. 97 (1976).............................................................22

*United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995)......................................... 22-23

*Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) ....................................................19

## STATUTES AND OTHER AUTHORITIES

725 ILCS 5/108A-7.....................................................................................................28

7th Cir. R. 34(f)...........................................................................................................4

Fed. R. App. P. 34(a)(2)...........................................................................................4

## INTRODUCTION

Bernard Mims spent over a decade in prison for a murder he had nothing to do with. There was no physical evidence linking Mims to the crime, he did not match the description originally provided by eyewitnesses, and, at the time, he was recovering from a gunshot wound that would have made it nearly impossible for him to have committed the crime. The investigation into the case had gone cold for two years before the Chicago Police detectives set their sights on Mims, developing extremely thin "eyewitness" testimony based on problematic photo arrays (conducted many years after the fact) to convict him and send him to prison.

Over ten years later, following a re-investigation by the Cook County Conviction Integrity Unit, Mims's conviction was vacated. He was released from prison on the State's own motion, and he obtained a Certificate of Innocence without opposition from the State.

Mims brought this lawsuit alleging violations of his constitutional rights leading to his wrongful incarceration. Specifically, the Defendant police officers violated *Brady v. Maryland* by withholding an audiotape containing an alternative suspect's recorded acknowledgment (on a consensual overhear tape) that he had previously made admissions about having committed the crime. A reasonable jury could have concluded that had this exculpatory evidence been disclosed as required by the rules and the Constitution, Mims could have successfully cast doubt on the

1

extremely weak criminal case against him and never been convicted. Mims's complaint further alleged that the Chicago Police Department had a disturbing policy and practice of similar constitutional violations, leading to a massive wave of wrongful convictions.

The Defendant police officers offered no legitimate justification for having withheld this recording. They had sought judicial approval to wire up a witness specifically because they believed that the person being recorded (not Mims) had committed the crime. Years later, after the officers moved on from that suspect and instead focused (incorrectly) on Mims, the tape containing the exculpatory admission inexplicably disappeared from the set of tapes provided by the police to the prosecutor in connection with the Mims prosecution.

The district court nonetheless granted summary judgment, erroneously concluding that even though Mims established his defense counsel never received the exculpatory recording, he had failed to point to any record evidence showing that the Defendant officers, as opposed to the prosecution, were responsible for the missing evidence. That was simply wrong. Mims pointed to ample evidence that was before the district court—including testimony of the lead prosecutor who swore that he relied on the police to provide him with all relevant materials, and that he had tendered to defense all audio recordings he had been given—supporting an inference that Defendants had suppressed the recording.

In disagreeing, the court's summary judgment opinion claimed that it could not properly consider these arguments because the relevant deposition pages were missing from the summary judgment filings. This too was incorrect. The deposition pages were in the record in a timely amended filing, and the district court's failure to notice them should not have been a basis to dismiss the case. Accordingly, this Court should reverse the district court's entry of judgment for Defendants on the *Brady* claim.

## JURISDICTIONAL STATEMENT

Bernard Mims filed this action under 42 U.S.C. § 1983 and Illinois state law in the United States District Court for the Northern District of Illinois. The district court had jurisdiction over Mims's federal claims under 28 U.S.C. § 1331 because Mims brought those claims under the United States Constitution. The district court had supplemental jurisdiction of Mims's state-law claims under 28 U.S.C. § 1367. The district court entered summary judgment against Mims on March 12, 2024. A39.[1] Mims timely noticed his appeal on April 9, 2024. A40. The district court's final order, however, did not record the disposition of the case against three defendants. A39; *see also* App. Dkt. 12. On May 1, 2024, this Court remanded the appeal to the district court to enter a complete Rule 58 judgment. *Id*. The district

---

[1] Citations to "A" are to Appellant's required Short Appendix. Citations to "ECF" are to the district court docket. Citations to "App. Dkt." are to the docket on appeal.

court amended its judgment on May 8, 2024. A42; *see also* App. Dkt. 14. This Court has jurisdiction to review the district court's final order under 28 U.S.C. § 1291.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests that oral argument be granted because this case raises important issues regarding the evidence needed to establish the elements of a *Brady*-based due process claim and the state of the law in this Circuit on the matter. This counseled case provides a good vehicle for this Court to reiterate and clarify the applicable law. Accordingly, Appellant Bernard Mims respectfully requests oral argument. *See* Fed. R. App. P. 34(a)(2); 7th Cir. R. 34(f).

## STATEMENT OF ISSUES

I.  Whether the district court erred in concluding that Mims failed to support with evidence his *Brady* claim, even though he pointed to significant record evidence supporting an inference that Defendant officers suppressed a materially favorable audio recording implicating viable alternative suspects to the murder for which Mims was convicted.

II. Whether the district court erred in concluding that Defendants were entitled to qualified immunity on Mims's *Brady* claim, even though it has been clearly established since 1963 that police officers cannot withhold materially favorable evidence from the prosecution.

## STATEMENT OF CASE

### I.      Factual Background

Following a bench trial in May of 2006, Bernard Mims was wrongfully convicted of the murder of Dwayne Baker. ECF 180-10, Ex. 94: Verdict, at 132-33.[2] He spent over a decade incarcerated for a crime he did not commit. ECF 180-12, Ex. 103: Order re Release, at 127.

### The Baker Murder

On October 12, 2000, Baker was shot and killed with an assault-style rifle in front of the Rosenwald Building in Chicago. ECF 180-1, Ex. 9: Jones Supp. Rpt., at 313-16. At the time of his death, Baker was employed by the Cook County Sherriff's Office and was acting as security at the building. *Id*.

Officers of the Chicago Police Department interviewed several eyewitnesses. *Id.* at 318-33; ECF 180-1, Ex. 10: McNally Supp. Rpt., at 348-53. The police learned that, at the time of the shooting, the Black Disciples ("BD") were feuding with the Gangster Disciples ("GD") in the area where the shooting took place. *Id*. They came to believe the intended victim of the murder was a high-ranking member of the Gangster Disciples ("GD"), and that the shooter mistook Baker for that member. *Id*.

---

[2] ECF 180 is an exhibit index to Defendants' Statement of Material Facts. The attached exhibits each contain multiple exhibits—ECF 180-1, for example, contains Exhibits 1-19. For ease, Appellant cites to the page number appearing in the ECF heading at the top of each page.

## Mims's Innocence

Initially, no witness identified Mims as the shooter. *See id*. That's because he was not the shooter. *See* ECF 180-12, Ex. 107: Order re Innocence, at 182. The eyewitness who got the best look at the shooter helped police create a composite sketch that showed the shooter had a full beard. ECF 180-1, Ex. 10 at 348. Mims did not have a beard. *See* ECF 180-6, Ex. 51: Mims's Mugshots, at 79-80. In addition, at the time of Baker's murder, Mims was recovering from a gunshot wound to his penis he sustained just days prior that would have made it near impossible for him to have murdered Baker. ECF 180-10, Ex. 90: Eason Trial Tr., at 47-53. He could barely walk without assistance, much less wield an assault rifle. *Id*.; *see also* ECF 180-12, Ex. 105: CCSAO Email, at 130 ("The medical condition of Mims at the time that the crime was committed was certainly a factor that was considered and which contributed to this decision [to dismiss the case in the interests of justice].").

## Sardin's Admission

Months later, Detective Daniel McNally interviewed a BD member named Melvin Richardson, after his arrest on an unrelated matter triggered an investigative alert. ECF 180-2, Ex. 28: Richardson Arrest Rpt., at 67-68; ECF 180-2, Ex. 25: Investigative Alert, at 54-55. Richardson denied involvement in the Baker homicide, but told McNally that another BD, Michael Sardin, admitted to Richardson that he (Sardin) and two other BDs—Dwayne Chester and Taboo McNeil—committed the

Baker shooting. ECF 180-2, Ex. 30: McNally COH-13 App., at 104-06; ECF 202-4, McNally Dep., at 134:6-135:13. Richardson agreed to sit for a polygraph to confirm the information, and the resulting examination indicated no deception. *Id*.; ECF 180-2, Ex. 31: Polygraph File, at 112.

Thereafter, Richardson agreed to wear a wire to record some conversations with Sardin. ECF 180-2, Ex. 30 at 104-06. Detective McNally obtained an order from Cook County Circuit Judge Michael Toomin allowing the recording—confidential overhear ("COH")—to be made. *Id*. at 102-03.

During one recorded conversation, Sardin admitted to previously confessing to Richardson (in an unrecorded conversation). He tried to walk back his prior admission, claiming he only admitted to the crime because he had been drunk, but did acknowledge having made the admission. ECF 187-17, Audio Recording Tr., at 5-6, 8. Sardin also discussed how the BDs disposed of the vehicle and gun used in the homicide. *Id*. at 9.

After listening to the recording, Detective McNally believed that Richardson revealed the wire to Sardin before talking to him without telling law enforcement. ECF 202-4 at 166:7-169:19, 182:14-184:21. This may have explained why Sardin acknowledged, but tried to disavow, his prior admission regarding the Baker crime. *Id.*

All told, there were five audio files generated from the Richardson COH (COH-13). *See* ECF 187, Exhibits 12-16. Detective McNally, who coordinated the effort to obtain the recorded conversation, knew about the recordings, including the one where Sardin admitted that he previously told Richardson that he was involved in the Baker murder. ECF 202-4, McNally Dep, at 166:7-169:19. Detective Ted Przepiora also knew about this recording and the statements made by Sardin. ECF 180-3, Ex. 35: Timeline, at 6.

### The Case Goes Cold

In March 2001, shortly after the recordings were made, Judge Toomin entered a retention and review order stating that he had listened to the tapes, and ordering that the original tapes be impounded with the Clerk of the Court. ECF 180-2, Ex. 30 at 108. Afterwards, the case went cold.

### The Cold Case Re-investigation

Several years later, in November 2003, the investigators revived the case in an attempt to clear it. They claim to have received a confidential tip that supposedly put the spotlight back on a witness named Thomasina McKee. Detective Przepiora had previously interviewed McKee in June of 2001. ECF 180-4, Ex. 41: Przepiora Supp. Rpt., at 18. At that time, Przepiora supposedly showed McKee a photo array where she identified Mims as one of the perpetrators. *Id*.

McKee had a different recollection, testifying that she was shown a single photograph in 2001 and asked if that was who she saw commit the shooting (which would be an unduly suggestive procedure). ECF 183-3, McKee Grand Jury Tr., at 32, 41-42; ECF 187-9, Rosenthal Rpt., at 24-25. Przepiora's report for this interview, submitted three *years* later, does not state that he showed her any photo array. ECF 183-2, GPR re McKee. And even though McKee had supposedly identified Mims in 2001, Przepiora took no additional investigative action, and the case went cold.

More than two years later, in November 2003, Przepiora reinterviewed McKee. Przepiora's report of that interview indicates that McKee gave the same account of the shooting and again identified Mims out of the photo array she was previously shown. ECF 180-4, Ex. 41 at 18; ECF 202-5, Przepiora Dep., at 201:19-04:12; *see also* ECF 187-28, Kaminski Suppression Hrg., at 3-4 (Przepiora's partner testifying that the photo array shown to McKee in 2003 was compiled in 2003).

Even though more than three years had passed since the shooting, thereby sharply reducing the odds that any human being could truly make a reliable identification absent improper suggestion, Przepiora then began a hunt for other witnesses to whom he could show his photo array. ECF 180-7, Ex. 63: Investigative Alert, at 57-58. First, Przepiora sought out Wallace Fields, who had been interviewed shortly after the shooting. ECF 180-1, Ex. 10 at 350-52. The account Fields had given at that time contradicted what detectives had learned from other

eyewitnesses. Fields, for example, told detectives that he saw the suspect shoot numerous times at Baker and then walk directly up to Baker and shoot him as he lay on the ground, something no other witness said. *Id.*

Przepiora found and interviewed Fields in early 2004. ECF 180-7, Ex. 64: Przepiora Supp. Rpt., at 74-75. Fields viewed the photo array—*almost four years* after the shooting—and identified Mims' photo as the man who had fired an assault rifle towards the Rosenwald the night of the Baker murder. *Id.* According to Plaintiff's eyewitness identification expert, any "identification" under these conditions would be extremely dubious and unreliable. ECF 187-25, Cutler Rpt., at 10-14. That's especially so because Fields testified that he had never seen the shooter before the night of the Baker murder. *Id.*; ECF 183-6, Fields Grand Jury Tr., at 18.

**Mims' Arrest and Prosecution**

Shortly after having been supposedly identified by the aforementioned photo array procedures, and four years after the crime occurred, Mims was arrested and charged with Baker's murder. ECF 180-7, Ex. 72: Arrest Warrant, at 95-96.

Assistant States Attorney ("ASA") William Delaney was the lead prosecutor on the case. ECF 202-8, Delaney Dep., at 17:11-19:8. The prosecution tendered to defense certain materials in its possession, including two conversations recorded pursuant to COH-13. ECF 187-32, Prosecution Notes, at 1. Neither of those recordings was of the conversation between Richardson and Sardin where Sardin

admitted to previously telling Richardson he was involved in the Baker murder. *Id.*; *see also*, ECF 202-8, Delaney Dep. Tr., at 163:19-165:5. In other words, the State tendered some of the COHs, but not the exculpatory one.

Przepiora and McNally both agreed that the information Richardson received from Sardin (which Sardin admitted to previously providing on the COH that was not disclosed) was a third-party admission that was important to the investigation. ECF 202-4 at 131:14-133:9, 166:7-169:19; ECF 180-3, Ex. 35 at 6 (Przepiora wrote: "CI states that he is [sic] *third party admission from SARDIN on BAKER homicide. SARDIN identifies co-offenders as Taboo McNIEL and Dewayne CHESTER.*") (emphasis added).

In civil discovery in this case, ASA Delaney testified about the missing tape, and how it came to be withheld from Mim's criminal defense. He swore that: (1) he learned about the COH-13 recordings (the non-exculpatory tapes that were disclosed) from Detective Przepiora at the same time Przepiora supplied Delaney with an overall timeline involving the Baker murder, ECF 202-8, Delaney Dep. Tr., at 44:21-45:23; (2) he obtained the COH documents that he produced to Mims's defense counsel from the Chicago Police Department ("CPD"), *id.* at 156:11-161:3; (3) he relied on the CPD to supply him with all the relevant documents for the investigation, *id.* at 64:13-18; and (4) he tendered two audio recordings from COH-13 to defense counsel, neither of which contained Sardin's admission that he had

previously told Richardson he was involved in the Baker murder, *id.* at 163:19-165:5.

ASA Delaney verified before trial that the State had turned over all materials in its possession pertaining to COH-13. ECF 187-35, Ans. To Defs. Discovery Req., ¶ 2 ("The People have tendered to the defendant all discovery, including law enforcement and State's Attorney reports and memoranda that they possess and know to exist – through diligent good-faith efforts – related to the Application for use of an Eavesdropping device under 2001 COH-013."). His attestations were accurate to the extent that the Baker homicide file at the CCSAO only contained the tapes tendered to the defense. ECF 202-8 at 160:21-161:3. However, the exculpatory COH was not in the CCSAO file and was not disclosed. *Id.*

At a bench trial, the primary evidence against Mims was the testimony of McKee and Fields, two witnesses who participated in photo array lineups years after the fact and supposedly "identified" Mims as Baker's shooter. ECF 180-8, Ex. 84: McKee Trial Tr., at 50-121; ECF 180-8, Ex. 85: Fields Trial Tr., at 122-207. Those "photo arrays" were problematic for myriad reasons, including: (1) the other photos in the array did not resemble Mims, including that Mims's photo depicted him wearing a black jacket, which is what eyewitnesses said the shooter was wearing, ECF 187-9 at 24; and (2) the police did not document who was in the arrays, which

witnesses were shown what arrays, or what was said to the witnesses when they were shown the arrays, *id*.

Mims was nonetheless convicted and sentenced to 95 years in prison. ECF 180-10, Ex. 94 at 132-33; ECF 180-11, Ex. 95: Sentence, at 40-41.

### Mims' Exoneration

After serving over a decade of his sentence, the Cook County State's Attorney's Office ("CCSAO") Conviction Integrity Unit re-investigated Mims's conviction. ECF 180-12, Ex. 102: CCSAO Pet., at 125. As a result of that re-investigation, the State moved to vacate Mims's conviction and dismiss the charges against him. *Id*. The court granted the motion and ordered Mims's release. ECF 180-12, Ex. 103 at 127.

Mims later obtained a Certificate of Innocence, which the CCSAO did not oppose. ECF 180-12, Ex. 107 at 182.

## II.    Procedural Background

On October 26, 2018, Mims filed this civil rights action under 42 U.S.C. § 1983 and Illinois state law. ECF 1. Relevant here, Mims claimed that Defendant Detectives Daniel McNally and Ted Przepiora withheld exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). *Id*. ¶¶ 176-79. Specifically, Mims alleged that those Defendants withheld the COH-13 audio recording where Sardin admitted to previously telling Richardson that he (Sardin) had participated in the Baker

murder with two other BDs, neither of which was Mims. ECF 184, Mims's Summary Judgment Resp., at 11-12.

By the time the district court ruled on summary judgment, two substantive claims remained: The *Brady* claim and a due process claim for fabrication of evidence related to the photo arrays. A13-15. There were also claims for indemnification and *respondeat superior* against the City of Chicago. A13-14. The district court only ruled as to the substantive claims. A37-38. Mims's appeal is limited to the district court's ruling on the *Brady* claim against McNally and Przepiora regarding the failure to disclose the exculpatory COH tape.

Defendants moved for summary judgment on the *Brady* claim, arguing that Mims had failed to adduce evidence that the withheld COH-13 recording contained anything exculpatory or that Defendants, as opposed to ASA Delaney, were responsible for the missing recording. ECF 178, Defs. Summary Judgment Mot., at 27, 29; *see also* ECF 200, Defs. Summary Judgment Reply, at 18-21. Defendants further asserted their entitlement to qualified immunity on the *Brady* claim. ECF 178 at 42; ECF 200 at 22-24.

Mims opposed the motion. ECF 184. He pointed to evidence supporting an inference that Defendants McNally and Przepiora were aware of the exculpatory information contained on one of the COH-13 recordings, including the fact that both Defendants admitted in their written log that the information—Sardin's previous

confession to Richardson that he (Sardin) and two other BDs committed the shooting—was an important third-party admission. *Id*. at 12. And he pointed to evidence supporting an inference that the Defendants did not give the recording to ASA Delaney, including the fact that neither ASA Delaney nor defense counsel had the recording in their files. *Id*. at 12. Qualified immunity, Mims went on, could not protect Defendants, as it had been clearly established for decades that police officers must disclose exculpatory evidence. *Id*.

The district court entered summary judgment for Defendants. A1-38. The court concluded that although Mims had adequately shown that his defense attorney did not receive the recording at issue from ASA Delaney, he had failed to show that Defendants had withheld the recording from the prosecutor. A17. It reasoned that although Mims had cited ASA Delaney's deposition testimony to support his position, the pages Mims cited were missing from the record. A17-18. Regardless, the court also concluded that the recording in question was not material because the supposed "confession" by Sardin was "hardly a smoking gun." A20-21. That was especially so, the court reasoned, because Judge Toomin had listened to the COH-13 recordings back in 2001, years before he conducted Mims's bench trial, yet he rendered a guilty verdict. A21-22. Finally, and "in the interest of completeness," the court determined that Defendants were entitled to qualified immunity. A34. It recognized that caselaw clearly established that officers were required to disclose

exculpatory evidence to the prosecution; however, Defendants had "g[iven] the recording to the prosecutors," and no clearly established law required more of the Defendant officers. A35.

Mims timely noticed this appeal. A40.

## SUMMARY OF ARGUMENT

**I.** Defendants violated *Brady v. Maryland* when they withheld an audio recording containing materially favorable evidence from Mims. **A.** In the recording, Sardin acknowledges that he previously confessed to Richardson in an unrecorded conversation that he (Sardin) and two others committed the Baker murder. That the audio recording points to viable alternative suspects is obviously favorable evidence under *Brady*. And the evidence is material. The case against Mims was extremely weak, resting on two problematic photo-array identifications. Not only does the recording contain persuasive evidence of alternative culprits, but the very fact that Defendants did not turn it over undermines the quality of the investigation. Accordingly, had Mims been armed with the recording, there is a reasonable probability that the outcome of his criminal trial would have been different. **B.** The record is replete with evidence that Defendant officers were responsible for the fact that the exculpatory audio recording never made it to Mims's defense counsel. The lead prosecutor testified that he relied on the police to supply him with *all* relevant materials, that the police had produced some COH recordings, and that he had

tendered what he had been given to the defense: Two, non-exculpatory recordings from the same COH as the exculpatory one that was withheld. A reasonable inference from that evidence, and the one the district court was required to make, is that the Defendant officers withheld the exculpatory recording from the prosecution.

**II.** The district court also concluded that Defendants were entitled to qualified immunity. But Mims adequately supported his *Brady* claim, and the law is clear that police officers violate the Constitution when they withhold materially exculpatory material from a criminal defendant. That is so even without a precisely identical prior "similar case," a requirement this Court rejects when it comes to *Brady* claims.

## STANDARD OF REVIEW

This Court reviews a district court's entry of summary judgment *de novo*. At summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up). Summary judgment is appropriate only where, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020); *see also Tolan*, 572 U.S at 651.

## ARGUMENT

### I.     Defendants Withheld Material *Brady* Evidence From Mims.

To prevail on a *Brady* claim against a police officer, a plaintiff must prove three elements: "(1) the evidence at issue was favorable to the accused …, (2) the evidence must have been suppressed by the [officer] …, and (3) "the evidence must have been material … ." *Beaman v. Freesmeyer*, 776 F.3d 500, 506 (7th Cir. 2015); *see also Anderson v. City of Rockford*, 932 F.3d 494, 505 (7th Cir. 2019).

Because the record below contains ample evidence supporting an inference that Defendants McNally and Przepiora knew that one of the audio recordings between Richardson and Sardin contained favorable material information and nevertheless withheld that recording from the prosecutor, the district court erred in concluding that Mims failed to support his *Brady* claim.

### A.     The Information Contained On The Suppressed Audio Recording Was Exculpatory and Material.

Appellant begins with the first and third prongs of a *Brady* claim: Whether the withheld evidence is (1) favorable and (2) material.

First, the audio recording is obviously favorable to Mims, and certainly with all inferences drawn in his favor. Information pointing to a viable alternative suspect is favorable evidence under *Brady*. *See, e.g.*, *Goudy v. Basinger*, 604 F. 3d 394, 399 (7th Cir. 2010) ("[E]yewitness statements identifying [the alternative suspect] as the gunman impeach his testimony and exculpate [plaintiff] by suggesting he was not

one of the shooters."); *see also Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010) ("[N]ew evidence suggesting an alternative perpetrator is 'classic *Brady* material.'" (quoting *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001)).

Drawing inferences in Plaintiff's favor, the suppressed audio recording contains evidence of viable alternative suspects to the Baker murder. Prior to the recording, Richardson told Defendant McNally that Sardin admitted that he (Sardin), Chester, and McNeil killed Baker. ECF 180-2, Ex. 30 at 104-06. Richardson agreed to a polygraph examination, and no deception was detected. *Id*.; ECF 180-2, Ex. 31 at 112. In the later audio recording, Richardson and Sardin are heard talking about the Baker murder. ECF 187-17 at 5-8. Richardson says several times that he was worried that the police were going to come get Sardin because Sardin had told him he was involved in the murder, and Sardin acknowledges to previously saying as much, but tries to claim that he only made the admission because he had been drunk:

> [Richardson]: … I'm thinking they're fixing to come get you and shit, man. Dead ass. Why you say that shit?
>
> [Sardin]: Hell no. I was just fucking with your stupid ass.
>
> [Richardson]: You just fucking with me?
>
> [Sardin]: Uh-huh. …
>
> [Richardson]: … I was worried about – I thought they were fixing to come and scoop your ass up, man. That shit you told me, man. You ass – you shouldn't – man, be that shit had me spooked, yeah. I thought them Pos were going to come scoop you up, man.
>
> [Sardin]: I know.

[Richardson]: I had a feeling that shit – your ass didn't do that shit. You were drunk that night, too.

[Sardin]: On video, I was drunk as hell.

[Richardson]: **You said that shit?**

[Sardin]: **What? Yeah, I did.**

ECF 187-17 at 7-8 (emphasis added).

A reasonable inference from that exchange is that Sardin previously told Richardson that he, Chester, and McNeil were responsible for the Baker murder—not Mims. That inference is even more reasonable given that there is a logical explanation for why Sardin suddenly changed his tune: Richardson showed the wire to Sardin and that's why Sardin denied involvement. *See* ECF 202-4 at 166:7-169:19; 16, 182:14-184:21.

Second, the suppressed audio recording was material. Suppressed evidence is material if there is a reasonable probability that the verdict by the finder of fact would have been different if the evidence had been presented to it. *See Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019). Materiality does not demand proof that the disclosure would have changed the result. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The question is simply whether "the cumulative effect of all the suppressed information is to undermine confidence in the verdict." *Goudy*, 922 F.3d at 842.

The audio recording was material precisely because it is evidence of viable alternative suspects to the Baker murder. Defendants McNally and Przepiora

recognized the obvious: That Sardin's previous confession to Richardson that he committed the Baker murder with McNeil and Chester was an important third-party admission which would be admissible as substantive evidence at Mims's trial. ECF 202-4 at 131:14-133:9, 166:7-169:19; ECF 180-3, Ex. 35 at 6; *see also* 725 ILCS 5/115-10.1(2)(C). And McNeil had previously been implicated by another BD named Dan Thomas, who told an investigating officer that a BD named "Sleepy" told him (Thomas) that Taboo McNeil killed a policeman at the Rosenwald building. ECF 183-1, Boudreau COH-03 App., at 4-5. The information implicating McNeil matched the Defendants' theory of the case and came from two separate sources within months of the shooting, both from within the BD gang—indeed, the information from both sources was deemed credible enough to apply for eavesdropping devices, which the circuit court granted. *Id*. at 6-7; ECF 180-2, Ex. 30 at 102-06; *see also* ECF 180-3, Ex. 35 at 6 (Przepiora writes, "Multiple CI's states [sic] that TABOO McNIEL is involved."). Moreover, in the recording, Sardin admits knowledge of how both the BDs disposed of the vehicle and the gun used in the crime. ECF 187-17 at 9.

Armed with that additional evidence implicating McNeil, the suppressed audio recording pointing to Sardin, McNeil, and Chester as alternative suspects may very well have overcome the showing required for the trial judge to allow Mims to argue that other culprits committed the murder. And in a case like this one—where

Mims had sustained a gunshot wound that incapacitated him and nothing tied Mims to the crime beyond two severely problematic photo-array identifications made long after the shooting took place—evidence of viable alternative suspects is reasonably likely to have caused a different result. In other words, when considered in light of the whole record, the evidence that Sardin actually *admitted* (even if he later said he did so only because he was drunk) to committing the shooting with Chester and McNeil is significant and tends to show that someone besides Mims could have committed the crime. *See United States v. Agurs*, 427 U.S. 97, 113 (1976) ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt"); *Smith v. Cain,* 565 U.S. 73, 75-76 (2012) (withheld evidence deemed sufficiently material where shaky eyewitness testimony was the only evidence implicating the suspect).

Not only is the audio recording material because it is evidence of alternate suspects, but the fact that Defendants did not turn it over to the prosecution (without any justification, much less a good one) contributes to and reinforces a conclusion a factfinder could draw that the defendants "had for whatever reason decided … to put [Mims] away … regardless of the evidence." *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988); *see also Kyles*, 514 U.S. at 445 (explaining that withheld evidence "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation"); *United States v. Boyd*, 55 F.3d 239, 246 (7th

Cir. 1995) (finding that had the benefits been disclosed, the jury might have questioned the key witnesses' credibility and wondered whether "the prosecution team must have had *desperate* doubts about the testimonial reliability of these witnesses to have lavished such extraordinary personal attention upon them"); *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("The withheld evidence also raises serious questions about the manner, quality, and thoroughness of the investigation that led to [plaintiff's] arrest and trial. A common tactic of defense lawyers is to discredit the caliber of the investigation … and we may consider such use in assessing a possible *Brady* violation.").

In short, there is ample evidence supporting an inference that Defendants suppressed materially favorable evidence.

The district court concluded otherwise only after ignoring key evidence and drawing inferences against Mims, flipping the summary judgment standard on its head. The court reasoned that no factfinder could conclude that the recording would have made a difference because Sardin, rather than confess *again* on the tape, repeatedly denied his involvement in Baker's death. A20-21. That is particularly so because Judge Toomin listened to the recordings in 2001, shortly after they were made, and yet he still convicted Mims at the bench trial in 2006. A21-22. The district court's conclusion, premised on drawing inferences from the evidence in the wrong direction, is mistaken.

First, it is of no moment that the recorded conversation does not contain an outright confession from Sardin, and instead only reflects his acknowledgment of his prior confession to that effect. To be clear, the favorable materiality of the audio recording comes from the fact that Sardin admits on the recording *that he previously confessed* to participating in Baker's murder. In unduly crediting Sardin's attempts to disavow the prior statements, the district court failed to view the evidence in the light most favorable to the movant and ignored Sardin's motives to try to walk back his admissions. And Sardin's self-serving explanation that his prior confession was born out of drunkenness did not have to be credited by a finder of fact. Instead, a reasonable jury could conclude that Sardin only denied participating in Baker's death (after having previously admitted it) because Richardson showed Sardin the wire that was recording their conversation. Where the statements caught on tape acknowledge having previously made the prior admission and contained facts proving Sardin had knowledge of the crime, that should have been enough, and the district court should have allowed the jury to decide how much weight to give what.

The district court also went down the wrong path in accepting the Defendants argument that Judge Toomin listened to the recordings nearly five years before the bench trial. Judge Toomin supposedly listened to the tapes on March 9, 2001, while the investigation was still ongoing. That was three years before Mims was charged

in September of 2004, and over five years before Judge Toomin presided over the May 2006 bench trial.

As an initial matter, Sardin's admission on the audio recording could not have made immediate sense to Judge Toomin without adequate context. That includes, for example, the fact that when Richardson refers to, "What [Sardin] told [him] over there on the basketball court," ECF 187-17, that he is in fact referring to an earlier conversation where Sardin admitted he (Sardin), along with McNiel and Chester, murdered Baker. That is because just by listening to the recording (assuming the hypothetical that he truly focused for the entire—lengthy—time without the benefit of having any advocate to point him to the relevant parts and explain their relevance), Judge Toomin would not have the important context that Richardson had previously reported that he "was at the basketball court" when Sardin confessed to him. *See* ECF 180-2, Ex. 30 at 106.

Further, it strains credulity to say that Judge Toomin would have remembered what was on the tapes at the time he oversaw the trial half a decade later, much less based his guilty verdict on the materiality of those recordings. The court certainly never gave any indication of having even remotely considered any of this from five years earlier. A more reasonable inference, and the one most consistent with Judge Toomin's silence on the issue when reaching his verdict more than five years later, is that he had no memory of the exculpatory evidence on the suppressed recording.

Otherwise, Judge Toomin would himself be a party to violating Mims constitutional rights. There is ample basis for a reasonable jury to draw a contrary inference.

### B. Defendant Officers, Not The Prosecutor, Suppressed The Audio Recording.

As for the second prong of a *Brady* inquiry—whether Defendants withheld evidence of the audio recording from the prosecution—the evidence supports an inference that Defendants McNally and Przepioria knew about the materially exculpatory evidence of alternate perpetrators of the Baker murder contained in the recording yet withheld it from the prosecution.

To start, the evidence supports a reasonable inference that Defendants McNally and Przepiora knew of the exculpatory information contained in the recording. McNally, for his part, agreed at his deposition that the information contained on the tape was important. ECF 202-4 at 131:14-133:9. McNally also admitted to hearing Sardin, on one of the audio files, reference a prior conversation with Richardson where he made an admission of committing a crime, but Sardin said he was intoxicated at the time. *Id*. Przepiora, too, noted that Sardin's admission was an important third-party admission. ECF 180-3, Ex. 35 at 6. Further, ASA Delaney testified that he learned about the COH-13 recordings from Przepiora at the same time Przepiora supplied Delaney with an overall timeline involving the Baker murder. ECF 202-8 at 44:21-45:23.

The evidence is undisputed that although there were five recordings as part of COH-13, the police only gave ASA Delaney two of them. Delaney testified that the COH recordings that he produced to Mims's defense counsel had been obtained from the police; indeed, he relied on CPD to supply him with *all* the relevant documents for the Baker murder investigation. ECF 202-8 at 64:13-18, 156:11-161:3. And Delaney tendered what he was given, including just two COH-13 audio recordings, to defense counsel. *Id.* at 163:19-165:5; *see also* ECF 187-35 ¶ 2. Of those two audio recordings that made their way to defense counsel, neither contained any third-party admission or other exculpatory information. From that evidence, a reasonable jury could conclude that: (1) the prosecution never gave Mims's defense attorney the recording where Sardin admitted he had previously confessed to Richardson that he (Sardin) participated in Baker's shooting; and (2) the prosecution did not give that recording to defense counsel because the Defendants decided not to turn it over.

The district court concluded otherwise only after making two glaring factual errors. First, the court incorrectly found that the evidence Mims cited to support the fact that Defendants did not turn over the exculpatory recording to the prosecution was not in the record. A17-18. As was just explained, Mims cited ASA Delaney's deposition transcript, where Delany testified that he would have gotten the COH documents he tendered to Mims's defense counsel "[f]rom the Chicago police." ECF 202-8 at 64:13-18, 156:11-161:3. Delaney further testified that he had produced the

COH-13 tapes available to him, which were two audio recordings containing no exculpatory material. *Id*. at 163:19-165:5. The court concluded that those transcript pages were not included in the record and chastised Mims that, without citing evidence in the record, he could not defeat summary judgment. A18-19. But the court was citing the original version of the exhibits Defendants had submitted. A18 (citing ECF 180-2, Ex. 33: Partial Delaney Dep.). Defendants later filed corrected versions of the depositions that were full transcripts, including Delaney's, which Mims cited to. *See* ECF 202-8, Full Delaney Dep. It therefore turns out that the evidence the district court proclaims to have been missing was there all along, the mistake having been made by the district court, not Mims. And, as already explained, that "missing" evidence supported Mims's assertion that Defendant officers, not the prosecution, were responsible for withholding the exculpatory audio recording.

Second, as further evidence that the Defendant officers did not suppress the recording, the court found that "the prosecutors gave the recordings to the trial court during the bench trial." A1. But that's not true, either. Pursuant to the COH statute, the police were required to give the recordings to the judge to review *before* the tapes were impounded. *See* 725 ILCS 5/108A-7. That happened. ECF 180-2, Ex. 30 at 108. And there is nothing in the record indicating that the tapes were again given to the judge (or the prosecutor) during trial or, for that matter, during pretrial proceedings.

\*     \*     \*

At bottom, Mims offered evidence from which a reasonable juror could conclude that the audio recording contained exculpatory and material information about viable alternate suspects. He also pointed to record evidence supporting an inference that Defendants McNally and Przepiora knew about the exculpatory information on the audio and nevertheless failed to turn it over to the prosecution – without explanation. Because the district court made conclusions to the contrary only after drawing inferences against Mims and making obviously false contentions, the entry of summary judgment in Defendants' favor should be reversed, and Mims should be permitted to have his claims decided by a finder of fact.

## II.     Defendants Are Not Entitled To Qualified Immunity.

The district court erred in granting qualified immunity to Defendants on Mims's *Brady* claim. In evaluating whether a defendant is shielded by qualified immunity, this Court asks: "(1) whether the facts, taken in the light most favorable to the plaintiff[], show[s] that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

Because Mims has shown that the Defendants deprived him of a constitutional right, the qualified immunity inquiry is simply whether the right was clearly

established when Defendants violated it. It was. *Brady* "has been on the books since 1963 and easily qualifies as clearly established law" for the purposes of qualified immunity. *Steidl v. Fermon*, 494 F. 3d 623, 628 (7th Cir. 2007); *Engel v. Buchan*, 710 F.3d 698, 699 (7th Cir. 2013) ("Because the *Brady* obligation was well established at the time of the events at issue... qualified immunity does not apply.").

It is, of course, immaterial that these precise facts have not come before the Court before. "[O]fficials can still be on notice that their conduct violates established law in even novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also Leister v. Kloth*, 933 F.3d 696, 702 (7th Cir. 2019) (same). For that reason, when it comes to *Brady* claims, this Court rejects a "similar case" requirement.

> [Defendants] assert that this behavior was not clearly prohibited at the time of its occurrence because no decision had dealt with a *Brady* claim that matched the facts in [plaintiff's] *Brady* claim. Following this logic, all *Brady* violations would receive qualified immunity because the facts of every case are unique. Instead, we hold that it is enough that, prior to the actions that gave rise to this case, it was well established that investigators who withhold exculpatory evidence from defendants violate the defendants constitutional due process right.

*Manning v. Miller*, 355 F.3d 1028, 1034 (7th Cir. 2004).

The lower court agreed: "Case law pre-dating 2000 establishes that officers must disclose exculpatory evidence to the prosecution." A35. But it nonetheless concluded that Defendants were entitled to qualified immunity because they "gave the recording to the prosecutors." *Id*. As was already explained, however, the district court only reached that conclusion after ignoring key record evidence Mims

explicitly placed before it and drawing inferences *against* Mims. *See supra* Subsection I.B. Those errors demand reversal of the court's conclusion that Defendants were entitled to qualified immunity on Mims's *Brady* claim.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's grant of summary judgment as to the *Brady* claim and remand for further proceedings.

Respectfully Submitted:

Date: January 22, 2025 /s/ Rosalind Dillon

Jennifer Blagg
Blagg Law
1509 W. Berwyn Ave.
Suite 201E
Chicago, IL 60640
773-859-0081
jennifer@blaggglaw.net

Jon Loevy
Rosalind Dillon
LOEVY + LOEVY
311 N. Aberdeen St., Fl. 3
Chicago, IL 60607
312-243-5900
dillon@loevy.com

*Counsel for Plaintiff-Appellant* Bernard Mims

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitations of Fed. R. App. P.

32(a)(7)(B) because this brief contains 7,140 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

in 14-point Times New Roman.


Date: January 22, 2025                              /s/ Rosalind Dillon
                                                    _____
                                                    Rosalind Dillon

## STATEMENT CONCERNING THE APPENDIX

Pursuant to Circuit Rule 30(d), I certify that all the materials required by Circuit Rules 30(a) and (b) are included in the attached appendix.

Date: January 22, 2025

/s/ Rosalind Dillon

Rosalind Dillon

# TABLE OF CONTENTS TO APPENDIX

Memorandum Opinion and Order, March 12, 2024 (Dkt. 211)......................................................A1

Judgment, March 12, 2024 (Dkt. 212)......................................................................................A39

Notice of Appeal, April 8, 2024 (DKt. 213) ...........................................................................A40

Amended Judgment, May 8, 2024 (Dkt. 223) .........................................................................A42

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BERNARD MIMS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-7192 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2000, Dwayne Baker was shot dead at an apartment building on Chicago's South Side. The Chicago Police Department believed that Baker was the victim of gang violence. The police suspected that members of the notorious Black Disciples gang had meant to kill Bolo Jones, a high-ranking member of the rival Gangster Disciples.

In 2004, after an investigation that lasted several years, Plaintiff Bernard Mims was charged with Baker's murder. At a bench trial in 2006, Mims was found guilty and sentenced to 95 years in prison.

In 2016 – after Mims had served over a decade in prison – Mims's conviction and sentence were vacated. He received a certificate of innocence from the state.

Mims turned around and sued the City of Chicago and the police officers involved in the Baker murder case. He brought a basket of constitutional claims, but a number of those claims have fallen by the wayside.

The remaining claims involve the alleged suppression and fabrication of evidence. Mims faults the police officers for suppressing recordings, even though the police gave the recordings to the prosecutors, and the prosecutors gave the recordings to the trial court during the bench

**A1**

trial.  He also faults the photo array as unduly suggestive.  One of the arguments is that the lineup included too many photos.

After extensive discovery, Defendants moved for summary judgment.  For the reasons explained below, Defendants' motion for summary judgment is granted.

## Background

### I.      The Baker Homicide

After midnight on October 12, 2000, a gold SUV pulled up to a gas station across the street from the front entrance of the Rosenwald, a housing project in Chicago's Bronzeville neighborhood.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 192).  Two people exited the vehicle and began shooting an AK-47 rifle toward the building's entrance.  *Id.*

Dwayne Baker – a security guard at the Rosenwald – was shot and killed.  *Id.* at ¶¶ 5–6.  Catrice Davis, a bystander, was shot in the leg.  *Id.* at ¶ 5.

### II.     The Investigation

Chicago police officers – including Defendants – began investigating right away, and interviewed dozens of witnesses about the shooting.  *Id.* at ¶ 8.

The witnesses gave the police varying descriptions of the shooter.  *Id.* at ¶ 9.  The witnesses described the shooter as a black male with a light or medium complexion.  *Id.*  The interviewees gave height estimates ranging from 5'7" to 6'1."  *Id.*  Witnesses estimated the shooter's age as somewhere between his late teens to his late twenties.  *Id.*

The interviewees gave varying descriptions of the shooter's attire.  At least one witness described the shooter as wearing dark pants and a jacket.  *Id.*  Another witness said that the shooter sported a blue denim suit.  *Id.*  Yet another witness claimed that the shooter wore a knee-length "Fog"-type jacket with a baseball cap.  *Id.*

2

**A2**

Witnesses also saw other people in the SUV, in addition to the shooter. *Id.* at ¶ 10. Witnesses reported a second man exiting the SUV, and one or two others inside the vehicle. *Id.* Witnesses also told the police that they saw the SUV speed off westbound on 47th Street after the shooting. *Id.*

Many witnesses believed that the shooting was gang-related. According to several witnesses (and even one FBI agent), the SUV occupants – including the shooter – were likely members of the Black Disciples gang. *Id.* at ¶ 12.

Those witnesses believed that the intended target was Kenneth "Bolo" Jones, a high-ranking member of the rival Gangster Disciples gang. He controlled the Gangster Disciples' drug sales around the Rosenwald building. *Id.* at ¶¶ 12–13.

Apparently, Jones (the intended victim) looked like Baker (the actual victim). *Id.* at ¶ 12. And Jones entered the Rosenwald Building shortly before the shooter killed Baker. *Id.* at ¶ 13.

Some of the interviews took place in the days after the shooting. And some of the interviews happened years later.

### A.     Interviews in the Days After the Shooting

One witness, Joseph Williams, was exiting the gas station across the street from the Rosenwald on the night of the homicide when the gold SUV pulled up. *Id.* at ¶ 11. The day after the shooting, Williams helped the police create a composite sketch of the shooter and the weapon. *Id.*

Williams described the shooter as a black male between the ages of 25–28, between 5'9" and 5'11", with a full beard and mustache, wearing a baseball cap. *Id.* Williams said the shooter exited the SUV through the rear passenger door, firing a military-type rifle at the Rosenwald. *Id.*

3

**A3**

The police also interviewed Bolo Jones (again, the intended victim) the day after the shooting. Jones said that multiple people warned him, just before the shooting, that it was not safe for him to be at the Rosenwald that night. *Id.* at ¶ 14.

Jones also told the police that, in the summer of 2000, the Black Disciples had twice fired shots at him at the gas station across from the Rosenwald. *Id.* Jones even named one of the shooters: a Black Disciple member named Melvin Richardson (more on him a little later). *Id.*

A day after interviewing Jones, the police interviewed Lamont Kent, another witness. *Id.* at ¶ 16. Kent was inside the Rosenwald at the time of the shooting. *Id.* He said that he looked out a window and saw the shooter holding a long black and grey gun. *Id.*

Kent described the shooter as a man with small to medium build between 5'11" and 6'1" wearing tan pants, a black and orange shirt, and possibly braids. Kent also told the police that an individual known as "Wallace" was outside the building just after the shooting and that Wallace could identify the shooter. *Id.*

"Wallace" was Wallace Fields. The police – including Defendant Detective Daniel McNally – interviewed Fields about a week and a half after the shooting. *Id.* at ¶ 17. Fields told the police that he had witnessed the homicide, and he described what happened. *Id.* He told the police that he saw two black males exit the gold SUV with guns, and that one gun was an AK-47. *Id.*

Fields described the shooter as a slim-built, 5'10" to 5'11", 170-pound male in his mid-twenties with a dark complexion, wearing all black and holding the AK-47. *Id.* According to a police report about the interview, Fields reported the shooter as someone he had seen before, but didn't know by name. *Id.*

4

**A4**

### B.     Interviews in the Months After the Shooting

Months later, on February 19, 2001, Melvin Richardson was arrested for possession of cocaine.  *Id.* at ¶ 20.  Again, Richardson was a Black Disciple.  Recall that Bolo Jones (likely the intended victim) claimed that Richardson had shot at him at the gas station across from the Rosenwald before the Baker homicide.

The arrest of Richardson triggered an investigative alert / stop order relating to the Baker shooting.  *Id.*  A day later, Detective McNally interviewed Richardson about the Baker homicide.  *Id.*

Richardson denied any involvement in the incident.  A polygraph that same day was consistent with his denial.  *Id.* at ¶¶ 20–21.

But Richardson told Detective McNally something else, too.  Richardson said that another Black Disciple, Mike Sardin, admitted to Richardson that he and two other Black Disciples (Taboo McNeal and Dwayne Chester) went to the Rosenwald to shoot rival Gangster Disciples on the night of Baker homicide.  *Id.* at ¶ 20.  According to Richardson, Sardin also told him that Chester had shot at the Rosenwald.  *Id.*

Richardson then agreed to wear a wire and record a conversation with Sardin about the Baker homicide.  *Id.* at ¶ 22.  Cook County Circuit Court Judge Michael P. Toomin granted an order allowing the recording to be made.[1]  *Id.*

---

[1]  Unfortunately, Judge Toomin passed away in 2023 after a prominent career on the bench spanning more than four decades.  *See Hon. Michael P. Toomin 1938-2023*, Illinois State Bar Ass'n (Aug. 7, 2023), https://www.isba.org/barnews/2023/08/honmichaelptoomin19382023 ("Judge Toomin will be remembered as 'judge's judge'; as a jurist whose knowledge of the law was encyclopedic; as a man of integrity and compassion; and as a friend who regaled his 'pals' with stories of his escapades during high school and his work on the bench."); Violet Miller, *Michael Toomin, Retired Cook County Judge Known for High-Profile Cases, Fight with Democratic Party, Dead at 85*, Chi. Sun-Times (July 22, 2023), https://chicago.suntimes.com/obituaries/2023/7/21/23803754/michael-toomin-obituary-retired-cook-county-judge-slating-fight-2020-vanecko-smollett-dies-at-85 ("His life was the law. . . . If there was a judge's hall of fame, he would be one of the first people admitted to it.") (quoting Assistant Cook County

During the recorded conversation, Sardin repeatedly denied that he or any other Black Disciple was involved in Baker's death. *Id.* at ¶ 24. But after listening to the recording, Detective McNally concluded that something was off about how Richardson structured his questions. *Id.* at ¶ 25. Detective McNally believed that Richardson somehow revealed the recording device to Sardin during the conversation, and felt deceived by Richardson. *Id.*

In March 2001, Judge Toomin entered a retention and review order stating that he had listened to the tapes made under his order. *Id.* at ¶ 25. Judge Toomin ordered the original tapes to be impounded with the Clerk of Court. *Id.*

### C. Interviews in the Years After the Shooting

By the next year, the Baker homicide was classified as a "cold case." A new investigative team – the Chicago Police Department Cold Case Squad – took over. *Id.* at ¶ 26.

While investigating the Baker case, the Cold Case Squad collaborated with a task force on an operation called "Operation Pickup." *Id.* at ¶ 27. The goal of Operation Pickup was to investigate and build federal RICO cases against Black Disciples gang members. *Id.*

In early 2001, a Black Disciple named Dan Thomas spoke to two of the new investigating officers – Defendants (and former Gang Crimes Specialists) Richard Peck and Robert Montgomery. *Id.* at ¶ 30. According to Thomas, another gang member told him that Taboo McNeal, a target of Operation Pickup, shot an officer at the Rosenwald on orders from a Black Disciples leader. *Id.*

---

Public Defender Bill Murray); Madeline Buckley & Shanzeh Ahmad, *'A Judge's Judge': Michael Toomin, Who Presided Over Major Trials and Juvenile Court, Dies After Retiring from Cook County Bench* (July 24, 2023, 10:21 PM), https://www.chicagotribune.com/2023/07/24/a-judges-judge-michael-toomin-who-presided-over-major-trials-and-juvenile-court-dies-after-retiring-from-cook-county-bench/ ("As a judge, he cultivated a reputation as a conscientious decision-maker and earned the affectionate nickname of the 'Toominator.'").

After that, another Defendant – Detective Kenneth Boudreau – spoke to Thomas. *Id.* at ¶ 31. Detective Boudreau then obtained an order (from Judge Toomin) to record a conversation between Thomas and other Black Disciples, including McNeal. *Id.*

But according to the Defendant officers, no officer ever acted on that judicial order. *Id.* at ¶ 32. No recording was seemingly ever made – at least, none was ever located. *Id.*

Around the same time, another witness, William Ransom, told Defendant Detective Michael McDermott that he knew a Black Disciples leader ordered four gang members – including Plaintiff Mims – to shoot any Gangster Disciples they encountered. *Id.* at ¶ 33.

Ransom also told McDermott about a separate shooting of a Gangster Disciple, who was killed with an AK-47 – the same type of weapon used in the Baker shooting. *Id.* And Ransom said that some Black Disciples had told him that their gang's leadership sent some members to the Rosenwald to kill a Gangster Disciple on October 12, 2000 – but that Baker was mistakenly killed instead. *Id.*

Based on this information, the police obtained judicial approval to record a conversation between Ransom and potential suspects. *Id.* at ¶ 34. But once again, no recording was ever made, or at least found. *Id.* at ¶ 35.

Fast forward a few months, to May 2001. Another officer on the new team, Defendant Detective Przepiora, learned about Thomasina McKee. McKee was a new, important lead. She was a purported witness to the Baker shooting who the police had not yet interviewed. *Id.* at ¶ 37.

Przepiora and McDermott interviewed McKee in June 2001. *Id.* at ¶ 38. McKee told the officers that she had witnessed the shooting with two other women.[2] *Id.* She said that she saw

---

[2] The police interviewed both women in 2004, more than three and a half years after the homicide. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 45 (Dckt. No. 192). Both women – Erma Jones and Danielle

who shot Baker. *Id.* McKee said that on the night of the shooting, she saw a black male emerge

from the rear passenger side of a gold SUV, holding an AK-47-type rifle. *Id.*

McKee described the shooter as 20–25 years old, 6'0" tall, and wearing a black hat, black

pants, and black jacket. *Id.* at ¶ 40. She identified the shooter as someone she knew as "Bern."

*Id.* at ¶ 38.

McKee said that she saw another individual exit the SUV's rear driver's side with a

chrome handgun. *Id.* McKee described the second person as a black male in dark clothing,

between 5'5" and 5'6" tall. *Id.* at ¶ 40.

After McKee's interview, she identified a photo of Mims as "Bern," and signed the back

of the photo.[3] *Id.* at ¶ 41. That photo of Mims was from a February 2000 arrest for criminal

trespass. The arrest report from that arrest described Mims as 6'2", 170 pounds, and 19 years

old, with braided hair, medium complexion, and the nickname "Berny." *Id.* at ¶ 42.

Other arrest reports (from June 4, 1999 and February 9, 2000) identify a tattoo reading

"Burn" on Mims's lower right arm. *Id.* Mims was arrested eight times in 2000, and most

mugshots depicted him with light facial hair. *Id.* at ¶ 43. Each fact was consistent with at least

some of the witnesses' accounts.

A few months after interviewing McKee, the police spoke to another witness, Tashunda

Crafton. *Id.* at ¶ 50. Crafton said she had been in a relationship with Baker (the victim) at the

---

Gaines – confirmed they were with McKee when Baker was shot. *Id.* But Jones and Gaines could not, or would not, identify the shooter from a photo array. *Id.*

[3] Defendants offer evidence that Przepiora prepared a photo array of potential suspects for McKee, including Mims, McNeal, and Sardin. *See* Przepiora Dep., at 105:7-13 (Dckt. No. 180-1, at page 227 of 426). Mims disputes Przepiora's deposition testimony that McKee was shown an array of suspects. He claims, instead, that officers showed McKee only the photo of Mims, and no other photos of potential suspects. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 192). In any event, McKee was re-interviewed in November 2003, and again identified the photo of Mims as the shooter and said she remembered signing the photo. *Id.* at ¶ 47.

**A8**

time of the shooting.  *Id.*  She told Detective Przepiora that on the night of the shooting, she saw "Bern" in the middle of the street near the Rosenwald, pointing a "chopper" (a term for an AK-47-type rifle) at the building.  *Id.*

Crafton also said that she had sold drugs for "Bern."  *Id.* at ¶ 51.  According to Crafton, sometime after the shooting, "Bern" threatened to beat her if she did not give him money or return drugs that he had fronted her, and he yelled, "That's why I shot your man!"  *Id.*  Crafton identified Mims as "Bern," and identified him in a photo array.  *Id.*

In December 2003, McKee testified before a grand jury.  *Id.* at ¶ 49.  Specifically, she testified that she knew Mims and saw him fire a rifle-style weapon at the Rosenwald before fleeing the scene.  *Id.*

Przepiora re-interviewed Crafton in December 2003 and October 2004.  *Id.* at ¶¶ 52–53.  Both times, Crafton largely repeated what she told the police back in 2001.  *Id.*

In 2003 and 2004, the police re-interviewed other witnesses, too.  In early 2004, officers spoke with Wallace Fields again.  *Id.* at ¶ 60.  They showed Fields a photo array, and Fields identified Mims as the shooter.  *Id.*  Fields signed the back of the photo, underneath McKee's signature from the 2001 photo identification.  *Id.*  Soon after Fields was re-interviewed, he testified before a grand jury that Mims shot Baker.  *Id.* at ¶ 61.

The police also re-interviewed Bolo Jones (the Gangster Disciple who was apparently the intended target of the shooting) in 2004.  *Id.* at ¶ 64.  Jones repeated much of what he told the police in 2000, right after the shooting.  *Id.*

But Jones gave the police new information, too.  For the first time, he told the police that he spoke to McKee two days after the shooting – and that McKee told him that she saw "Bern" shoot Baker.  *Id.*

Like McKee and Fields, Jones testified before a grand jury. *Id.* at ¶ 65. Jones testified that McKee told him that "Bern" from the Black Disciples killed Baker. *Id.* Jones also testified about why he believed that he was the shooter's intended target. *Id.*

Finally, Przepiora re-interviewed Williams (the witness who helped the police with a composite sketch of the shooter and gun) in June 2004. *Id.* at ¶ 66. Williams recounted his observations of the shooting, but he could not identify the shooter when the police presented him with a photo array. *Id.*

Williams then testified before a grand jury. *Id.* Williams testified that he saw an SUV enter the gas station. *Id.* Williams said he saw a man exit the SUV's rear passenger door holding an "AK." *Id.* Williams testified that the man had a dark complexion and five o'clock shadow-type mustache, beard, and goatee, and was wearing a black hat with a dark blue jean jumpsuit. *Id.*

## III. The Criminal Trial

Based on that body of evidence, Przepiora obtained an arrest warrant for Mims and took him into custody on July 7, 2004. *Id.* at ¶¶ 67–68. Three weeks later, the Cook County State's Attorney's Office sought an indictment from the grand jury. *Id.* at ¶ 71.

The grand jury returned indictments on one count of first-degree murder for Baker, and three counts of attempted murder for Davis (who was shot in the leg), and Edward Ross and Darrell Garrett (who were standing with Baker at the time of the shooting). *Id.*

Judge Toomin presided over the pretrial proceedings. *Id.* at ¶ 74. In 2005, Judge Toomin ordered that Mims should have access to all impounded records (including the 2001 recordings). *Id.* Mims's defense attorney (Daniel Franks) received at least two tapes. But after review, he believed that they had little evidentiary value. *Id.* at ¶ 75.

Franks moved to suppress the pretrial identifications by McKee and Fields, arguing that they were "unduly and improperly suggestive." *Id.* at ¶ 76. At a 2005 hearing, Judge Toomin found no evidence showing that the statements were tainted, and admitted the evidence. *Id.*

But Judge Toomin allowed Franks to reopen the motion to suppress in February 2006, just before Mims's trial was set to begin, for the purpose of questioning Officer Przepiora about McKee's identification. *Id.* at ¶ 77. Judge Toomin concluded that the procedures used did not taint the identification. *Id.* at ¶ 79.

Mims's bench trial before Judge Toomin began in February 2006. *Id.* at ¶ 74. At trial, Fields and McKee identified Mims and testified that they saw him shoot Baker. *Id.* at ¶¶ 82–83. Detective Przepiora testified, too. He testified that he interviewed Fields, and that Fields identified Mims. *Id.* at ¶ 86.

Gang Crimes Specialist Richard Lombard testified at trial about Mims's ties to the Black Disciples based on his tattoos, including the one reading "Burn." *Id.* at ¶ 84. The prosecution also presented testimony from Sheriff Robert Walker (a friend of Baker's), Officer Arthur Oswald (about forensics and ballistics recovered from the crime scene), Bolo Jones, Darrell Garrett, Dr. Mitra Kalelkar (a pathologist), and Kurt Zielinski (about ballistics evidence). *Id.* at ¶ 80.

Mims, for his part, called Donna Eason, his then-girlfriend and mother to five of his six children. *Id.* at ¶¶ 81, 87. Eason testified that Mims was home the night of the shooting, recovering from various injuries. *Id.* at ¶ 87. Mims also entered into evidence Fields's first interview with the police. *Id.* at ¶ 81. Mims did not testify. *Id.* at ¶ 87.

In rebuttal, the State called Cook County Hospital nurses who testified that Mims went to the hospital at least nine days before the Baker homicide for his earlier injuries, but that he had

11

**A11**

complained of no pain except upon palpation of his wound. *Id.* at ¶ 88. He was released from the hospital the same day he was admitted, without prescription medication. *Id.*

On May 16, 2006, Judge Toomin convicted Mims of the first-degree murder of Baker and the attempted murders of Garrett and Ross. *Id.* at ¶ 89. Judge Toomin sentenced Mims to 95 years in prison. *Id.*

## IV. Postconviction Proceedings

A decade later, in 2015 and 2016, the Cook County State's Attorney's Office Conviction Integrity Unit began investigating Mims's conviction. *Id.* at ¶ 94. And on October 27, 2016, that office filed a petition requesting Mims's conviction and sentence be vacated, and moved to drop the charges *nolle prosequi*. *Id.*

The office gave reasons for the dismissal, too. *Id.* at ¶ 96. It explained that Mims's medical condition at the time of the crime "was certainly a factor" that contributed to the decision. *Id.* Another contributing factor was the "troubling . . . dual representation of Mr. Mims and an alternate suspect in the crime by the same attorney, Dan Franks." *Id.*

A court ordered Mims's immediate release after the state moved to drop the charges. *Id.* at ¶ 94. And a week later, Mims filed for a Certificate of Innocence ("COI"), which was granted without opposition from the Cook County State's Attorney's Office. *Id.* at ¶ 97.

## V. The Lawsuit

In October 2018, Mims filed suit against the City of Chicago and Chicago police officers Kenneth Boudreau, Richard Peck, Robert Montgomery, Daniel McNally, Ted Przepiora, Michael McDermott, Raymond Kaminski, Jean Romic, and John Clisham. *See* Cplt. (Dckt. No. 1). The complaint contained nine counts.

12

**A12**

Counts I–VI allege various constitutional violations by each of the Officer Defendants. *See id.* at ¶¶ 176–211. Count I alleges destruction and/or concealment of material evidence. *Id.* at ¶¶ 176–79. Count II is about fabrication of evidence. *Id.* at ¶¶ 180–88. Count III is a claim about failure to intervene. *Id.* at ¶¶ 189–94. Count IV is a conspiracy claim. *Id.* at ¶¶ 195–201. Count V alleges unlawful pretrial detention. *Id.* at ¶¶ 202–06. Count VI is for deprivation of liberty without probable cause. *Id.* at ¶¶ 207–11.

Count VII is a state-law claim for malicious prosecution by the Officer Defendants. *Id.* at ¶¶ 212–19. Counts VIII and IX are against the City of Chicago for indemnification and *respondeat superior*, respectively. *Id.* at ¶¶ 220–25.

Fact discovery lasted more than two years. After turning over all of the stones in the quarry, Defendants filed a motion for summary judgment on all of Mims's claims. *See* Mtn. for Summ. J., at 2 (Dckt. No. 173). Defendants argued that each of the claims fails on the merits. *Id.* The Officer Defendants also contend that they are entitled to qualified immunity on the constitutional claims. *Id.* at 1–2.

In his response brief, Mims agreed to dismiss several of the claims. *See* Pl.'s Resp. (Dckt. No. 184). Mims does not oppose summary judgment on five counts: Count III (failure to intervene), Count IV (conspiracy), Count V (illegal pretrial detention), Count VI (deprivation of liberty without probable cause), and Count VII (malicious prosecution). *Id.* at 13. Mims also does not oppose dismissal of Defendants Boudreau, Peck, Montgomery, and Kaminski. *Id.* Those claims and those Defendants are hereby dismissed, with prejudice.

Only four claims are left. The remaining claims include a claim about the destruction or concealment of evidence (Count I), and about the fabrication of evidence (Count II). The two

**A13**

other claims involve the City of Chicago paying the tab under a theory of indemnification (Count VIII) or *respondeat superior* (Count IX).

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256. "[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Carmody v. Bd. of Tr. of Univ. of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018).

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**A14**

**Analysis**

Four claims remain in the case. Two of the claims are substantive claims, and the other two claims are about the City's obligation to pick up the tab.

The two substantive claims arise under the Due Process Clause of the Fourteenth Amendment. Count I alleges the concealment of evidence, and Count II alleges the fabrication of evidence through an unduly suggestive photo array. Counts VIII and IX are against the City for indemnification and *respondeat superior*, respectively.

The Court will address the two due process claims on the merits, before turning to qualified immunity. And then, the Court will turn to whether the City has a duty to pay, if any claim is left standing.

## I.      Concealment of Evidence (Count I)

The first claim alleges the concealment or destruction of evidence in violation of the Due Process Clause of the Fourteenth Amendment. *See* Cplt., at ¶¶ 176–79 (Dckt. No. 1). In response to the motion for summary judgment, Mims focuses only on the concealment of evidence, not the destruction of evidence. *See* Pl.'s Resp., at 11–12 (Dckt. No. 184). The Court will do the same.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The duty of production extends to the executive branch, including the police. *See Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). The police must disclose exculpatory evidence to the prosecutors so that they, in turn, can disclose the evidence to the defendant. *See Coleman v. City of Peoria*, 925 F.3d 336, 349 (7th Cir. 2019).

15

**A15**

"To prevail on a civil *Brady*-based due process claim against a police officer, a plaintiff must demonstrate that the evidence in question was favorable to him, the police 'suppressed' the favorable evidence, and prejudice ensued because the suppressed evidence was material." *Anderson v. City of Rockford*, 932 F.3d 494, 505 (7th Cir. 2019). Favorable evidence is either exculpatory or impeaching. *See Harris v. Kuba*, 486 F.3d 1010, 1016 (7th Cir. 2007).

"Evidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Carvajal*, 542 F.3d at 567.

Suppressed evidence is material if there is a reasonable probability that the verdict by the finder of fact would have been different if the evidence had been presented to it. *See Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019) ("*Goudy II*"). If, in light of the entire record, "the cumulative effect of all the suppressed information is to undermine confidence in the verdict," the evidence is material. *Id.* (quoting *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010)).

Mims brings his *Brady* claim against police officers (Przepiora and McNally), rather than against the prosecutors. So Mims must show that the *officers* suppressed the evidence. *See, e.g.*, *Cairel v. Alderden*, 821 F.3d 823, 832 (7th Cir. 2016) (affirming summary judgment in favor of detectives on a civil *Brady* claim when "undisputed facts show[ed] that exculpatory evidence was not concealed by the detectives as required to establish a civil *Brady* claim against them"); *Mosley v. City of Chicago,* 614 F.3d 391, 397–98 (7th Cir. 2010) (concluding that a civil *Brady* claim failed because the record lacked support for the notion that the officers withheld any favorable evidence).

Mims contends that his defense attorney (Franks) received only two recordings. And most importantly, defense counsel did not receive the recording where Sardin allegedly

"admitted confessing" that he had shot Baker. *See* Pl.'s Resp., at 11–12 (Dckt. No. 184). Mims asserts that a reasonable jury could determine that Officers Przepiora and McNally knew about exculpatory evidence, and failed to disclose it to the prosecutor. *Id.* at 12.

Mims attempts to build an inference of suppression by pointing to the number of recordings. *See* Pl.'s Resp., at 11–12 (Dckt. No. 184). There were five recordings in the so-called "consensual overheard." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 24 (Dckt. No. 192). But according to Mims, the prosecutor produced only two of the five recordings to defense counsel.

Mims skips over a link in the chain. It is not enough to show that defense counsel did not receive the recordings from the prosecutor. Mims needs to come forward with evidence that the police withheld those recordings from the prosecutor.

After all, the claim is against the police, not the prosecutor. The first link in the chain is from the police to the prosecutor, and the second link in the chain is from the prosecutor to defense counsel.

Evidence about the first link in the chain seems to be missing. Mims's brief makes the following statement about the recordings possessed by the prosecutor (Delaney): "The evidence shows that there were five recordings as part of COH-13. *Id.* ¶ 24. *ASA Delaney only had two of them. Id.* ¶ 75. Delaney gave those to Mims's defense attorney, Dan Franks. *Id.*" *See* Pl.'s Resp., at 11 (Dckt. No. 184) (citing Pl.'s Resp. to Defs.' Statement of Facts (Dckt. No. 192)) (emphasis added).[4]

The evidentiary basis for that statement seems to be missing from the record. Notice the citation – Mims relies on his response to paragraph 75 of Defendants' statement of material facts.

---

[4] The discussion of the *Brady* claim in Plaintiff's brief is rather cursory, spanning less than a page. *See* Pl.'s Resp., at 11–12 (Dckt. No. 184).

In that response, Mims wrote: "Admit, but state that Delaney's documents show he tendered only two audiotapes to Franks. Ex. 33 (Delaney Dep.) at 163. The two tapes that Delany [sic] tendered to Franks did not have exculpatory information on them. *Id.* at 164-65." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 75 (Dckt. No. 192).

This Court looked for those pages of testimony, but they appear to be missing from the record. The transcript of the Delaney deposition is in the record, but not the whole thing. The Delaney deposition transcript is in the record as Exhibit No. 33 as part of Defendants' statement of material facts. *See* Delaney Dep. Tr. (Dckt. No. 180-2, at 124–166 of 166).

But pages 163 to 165 were missing. The parties submitted only some of the pages, and the collection jumps from page 160 of the deposition transcript (Dckt. No. 180-2, at 161 of 166) to page 199 of the deposition transcript (Dckt. No. 180-2, at 162 of 166).

So, the record before the Court does not support the notion that the prosecutor produced only two of the five recordings to defense counsel. At best, the evidence in the record supports the notion that defense counsel listened to the recordings that he received, and did not believe that they contained exculpatory material.

And in any event, the passage in question addressed what recordings the prosecutor produced to defense counsel (*i.e.*, the second link in the chain). It did not address what recordings the police produced to the prosecutor (*i.e.*, the first link in the chain).

At best, Mims has come forward with evidence that defense counsel did not receive all of the recordings from the prosecutor. That's a foot in the door, but it is not enough to walk through the door of the courthouse and get to a jury.

To bring a claim against the police, Mims would need to come forward with evidence that the police withheld *Brady* material from the prosecutor. *See Coleman*, 925 F.3d at 349.

18

**A18**

And here, the record lacks evidence that the police withheld any recordings. The cited testimony does not support the notion that the police had the recordings, but the prosecutor *didn't*.

Maybe there is evidence somewhere else in the record to support the notion that the police did not produce all of the recordings to the prosecutor. But if so, it is not this Court's job to hunt for it. Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). "A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'" *Caisse Nationale de Credit v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (citation omitted); *Albrechtsen v. Bd. of Regents of Univ. of Wisconsin Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

The claim fails for a second, independent reason. On this record, no reasonable jury could find that the recordings in question were material. Even if defense counsel did not receive the recordings in question, no reasonable jury could conclude that they would have made a difference.

"Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Carvajal*, 542 F.3d at 567 (cleaned up). "The Supreme Court has made clear that *Brady*'s 'reasonable

probability' standard is less onerous than the traditional preponderance standard." *Anderson*, 932 F.3d at 505.

"[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). That is, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Courts must look at the cumulative effect of the suppressed evidence in light of the entire record. *Id.*

Mims describes the Sardin recording as a "confession," but it's not much of a confession. If the recording is a bombshell, it's a dud.

The conversation is not the easiest to follow, but it largely consists of Sardin denying involvement in the Baker murder. For example:

| | |
|---|---|
| SPEAKER 1: | [Richardson]: Man, you wasn't there, dude? |
| SPEAKER 2: | [Sardin]: Hell, no. |
| SPEAKER 1: | I'm talking about the truck, man. They – they – they – they burnt that truck up? |
| SPEAKER 2: | Man, I don't know. They ain't got that damn truck. |
| SPEAKER 1: | They ain't got it? |
| SPEAKER 2: | Hell, no. F*** me, man. |
| SPEAKER 1: | You ain't worried about that s***? |
| SPEAKER 2: | Hell, no. All I know I ain't did s***. I ain't worried about s***. I don't know nobody that did s*** for. I ain't do this s*** and I'm going to be right. |
| SPEAKER 1: | Why you telling me that s***, B? |

20

| SPEAKER 2: | What? |
|---|---|
| SPEAKER 1: | That you did that s***. |
| SPEAKER 2: | Hell, no, man. |

*See* 21_FEB_01_1750_TAPE2 Tr., at 4:6-22 (Dckt. No. 187-17). That's not much of a confession.

Interpreted in the light most favorable to Mims, another snippet of the recording contains thin evidence suggesting that Sardin had knowledge about the Baker murder. In another portion of the recording, Sardin mentions that "Bean got rid of" an AK-47 "same day that s*** happened." *See id.* at 8:11-19. Sardin also states that "They gave that s*** back to dude." *Id.* at 8:22-23. (This Court does not know who "Bean" and "Dude" are.)

At most, the recording might have given Franks (Mims's attorney) reason to investigate Sardin's knowledge of the crime. But Franks had access to the affidavits, applications, and judicial orders related to the recordings. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 74 (Dckt. No. 192). Those records were sufficient to signal to Franks that Sardin might have valuable information about the shooting. *See Cairel*, 821 F.3d at 832 (opining that *Brady* claim failed where plaintiffs could have developed the evidence that they argued was suppressed).

The recording itself was hardly a smoking gun. There is no "reasonable probability" that the verdict would have been different had Franks had access to the record. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999). Simply put, the recording was not material, and any nondisclosure would not have prejudiced Mims.

In fact, the record confirms that the recordings weren't material, for a basic reason. Judge Toomin received all five recordings. Judge Toomin listened to all five recordings. And the recordings did not make a difference.

**A21**

Mims claims that Franks (his defense attorney) only received a partial set of recordings from the prosecution.  But he does not contest that the recordings were possessed by the *court*.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 192).  Everyone agrees that Judge Toomin had them and heard them.

"On March 9, 2001, Judge Toomin entered a Retention and Review order, stating he listened to the tapes recorded under COH 013 and that copies were to be kept by the CCSAO, whereas the original tapes, as well as the original application and order allowing use of an eavesdropping device, were to be impounded with the Clerk of Court."  *Id.*

Judge Toomin issued an order when he impounded the recordings, saying:  "*I, Michael Toomin*, Judge of the Circuit Court of Cook County, Illinois, *have listened to the tapes* recorded under the above numbered judicial application and order . . . ."  *See* Ex. 30, 3/9/01 Retention and Review Order (Dckt. No. 180-2, at 108 of 166) (emphasis added).

Mims opted for a bench trial, before Judge Toomin.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 74 (Dckt. No. 192).  So, the trier of fact listened to the tapes.  And after listening to the recordings, Judge Toomin found Mims guilty.  The tapes did not change the outcome.

Regardless of whether Mims's attorney received all of the tapes, Judge Toomin heard them for himself.  Judge Toomin listened to the recording, and still returned a guilty verdict.

In sum, Mims's *Brady* claim falls apart on multiple levels.  There is no evidence in the record showing that the Officer Defendants suppressed evidence.  And on this record, a reasonable jury could not find that the recordings were material.  The Court therefore grants summary judgment on the claim about the concealment or destruction of evidence (Count I).

22

**A22**

## II.     Fabrication of Evidence (Count II)

Count II is another due process claim.  *See* Cplt., at ¶¶ 180–88 (Dckt. No. 1).  Mims

alleges that the officers fabricated evidence through an unduly suggestive photo array.

Officers violate a defendant's right to due process when they "knowingly use false

evidence . . . to obtain a tainted conviction."  *Napue v. People of State of Illinois*, 360 U.S. 264,

269 (1959).  To prove fabrication, Mims must show that Defendants knew, "with certainty," that

the evidence was false.  *See Coleman*, 925 F.3d at 344.

That's a high bar.  It does not satisfy the knowledge requirement to show that the officers

had reason to doubt the evidence.  *Id.* at 345.  "Fabricating evidence that the officer knows to be

false is different than getting a reluctant witness to say what may be true."  *Id.* at 346 (cleaned

up).  A fabrication of evidence claim is about the existence of certainty, not questions.  It's about

exclamation points, not question marks.

Mims's claim is about the identifications of Mims by McKee and Fields.  Basically,

Mims argues that Officer Przepiora "created false evidence by designing an identification

procedure – either a showup or improper 'array' – that he knew would result in McKee selecting

Mims. . . . The same applies to Fields, since Photo Array I was shown to Fields."  *See* Pl.'s

Resp., at 8 (Dckt. No. 184).

Once again, the bar is high.  "[T]he Fourteenth Amendment's Due Process Clause

requires the exclusion of an eyewitness identification if the unduly suggestive circumstances are

so egregious as to taint the entire trial."  *Coleman*, 925 F.3d at 347.  Courts use a two-step

analysis when evaluating claims about an unduly suggestive identification.  *See United States v.*

*Rogers*, 387 F.3d 925, 936 (7th Cir. 2004).

23

**A23**

"First, the defendant must establish that the identification procedure was unduly suggestive." *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007).  Second, if the procedure was unduly suggestive, the court must consider "the totality of the circumstances to determine whether the identification remains sufficiently reliable to still be admitted." *Manson v. Brathwaite*, 432 U.S. 98, 113–14 (1977).

Five factors come into play when evaluating reliability:  (1) the witness's opportunity to observe the offender; (2) the witness's degree of attention; (3) the accuracy of the witness's previous description of the offender; (4) the witness's degree of certainty; and (5) the amount of time between the crime and the confrontation.  *See Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

Mims's photograph is first from the left (he appears to have braids and light facial hair, and is wearing a black jacket) in the array below.  *See* Ex. 44 (Dckt. No. 180-5).



The Court will begin by addressing Mims's argument about the suggestive nature of the identification procedures.  Next, the Court will address whether the identifications were nonetheless reliable.  And then, the Court will assess whether there is sufficient evidence to show that the officers created evidence that they knew to be false.

24

**A24**

A. **Unduly Suggestive**

The first question is whether a reasonable jury could conclude that the photo array was unduly suggestive. Again, the Court views the evidence in a light favorable to Mims as the non-movant. Even with the scales in his favor, Mims does not put enough on the table to get to a jury.

Mims makes four main arguments about the suggestive nature of the photo array: (1) he was shown wearing a black jacket, which is what the shooter was described by some witnesses as wearing; (2) the other suspects do not resemble him; (3) multiple potential suspects were in the array; and (4) there were too many people in the array. *See* Pl.'s Resp., at 7–9 (Dckt. No. 184). The Court will address the arguments in that order.

First, Mims argues that the photo array was unduly suggestive because he was the only person wearing a black jacket.

In the array, Mims is pictured wearing a black jacket. And both McKee and Fields described the shooter as wearing black. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 17, 40 (Dckt. No. 192). So, the photo array showed Mims wearing a black jacket – just like the alleged shooter.

The police had other photos to choose from, too. In other mugshots, Mims was not wearing black. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 43 (Dckt. No. 192). The police could have selected a different picture of Mims wearing a different outfit.

"Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification." *Israel v. Odom,* 521 F.2d 1370, 1374 (7th Cir. 1975).

But a black jacket is not all that suggestive. Unlike, say, a red bucket hat or a yellow jersey, a black jacket is not a particularly distinctive item of clothing. It's a common article of clothing. If anything, a black jacket is the type of thing that you wear if you want to blend in, not stick out. If you think that a black jacket is distinctive, take a look down the street (or look in your closet).

So, standing alone, the fact that Mims was in black (and the shooter was also in black) is not especially suggestive. *See, e.g.*, *United States v. Williams*, 522 F.3d 809, 810–12 (7th Cir. 2008) (holding that a lineup was not unduly suggestive despite the fact that the defendant was the only one in the lineup wearing white tennis shoes – the same shoes that the suspect was reported as wearing); *United States v. Peterson*, 411 F. App'x 857, 864 (6th Cir. 2011) (rejecting defendant's claim that a photo array was unduly suggestive when he was the only one in dark clothing, similar to what the robber was described as wearing). He didn't stick out like a sore thumb, with the outfit screaming "Pick Me."

The photo array showed a wide range of colors of clothing. The range of colors ran the spectrum. Nothing stood out. Mims was not the only person wearing dark clothing, either. The person right below him in the lineup was wearing a black shirt. It is not as if Mims was wearing black, and everyone else was wearing white. The contrast was not stark.

And in any event, the color of clothing can carry only so much weight. It is not as if the police told the witnesses that they caught and photographed all of the people fleeing the scene, and the witnesses looked for a person wearing a black jacket, and saw only one option. People change clothes, and everyone knows that people change clothes. Unless clothing is truly distinctive – think Elton John – the clothing worn by participants in a photo array can get you only so far.

Second, Mims argues that no one else pictured in the array resembles him. That's tricky business, because whether someone looks like someone else is in eye of the beholder.

"A lineup of clones is not required." *United States v. Arrington*, 159 F.3d 1069, 1073 (7th Cir. 1998). "[D]ifferent skin coloration . . . is inevitable in any array or sequence of photos – just as it is inevitable that the facial hair, ear sizes, and chin shapes will not be identical." *United States v. Johnson*, 745 F.3d 227, 230 (7th Cir. 2014).

Witnesses described the shooter as a black male with a light or medium complexion. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 9 (Dckt. No. 192). The photographs show eleven men matching this description. While none of the other men could be mistaken for Mims's twin, their images aren't so dissimilar that the array is unduly suggestive, either. Nothing about his appearance in the photo array made Mims stand out from the crowd.

Third, Mims argues that the photo array was unduly suggestive because it contained multiple suspects. That is, Mims argues that the police filled the photo array with people that the police suspected were involved in the shooting. Imagine filling a lineup with The Joker, The Penguin, The Green Goblin, and Lex Luthor. It's like having a deck of cards, and stacking the deck with suspects. It increases the chances of picking *someone* who is a suspect.

Mims's expert opined that including multiple suspects makes a lineup like a multiple-choice test without wrong answers. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 17 (Dckt. No. 197).

The use of multiple suspects in the same photo array might have defied best police practices. But it did not increase the odds of picking *Mims*. Using photos of other suspects might increase the odds of the police getting an answer they like. But it does not increase the odds of choosing any *particular* suspect. *See Phillips v. Allen*, 743 F. Supp. 2d 931, 944 (N.D.

**A27**

Ill. 2010) (Dow, J.), *aff'd,* 668 F.3d 912 (7th Cir. 2012) (reasoning that photographic lineup was not unduly suggestive in part because witness "viewed either 30 or 36 photos. Lineups of far fewer individuals have been found sufficient.").

Fourth, Mims argues that the array included *too many* photos. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 13 (Dckt. No. 197). But increasing the number of photos *helped* Mims. Increasing the number of photos gave the witnesses more options to choose from, and thus more opportunities to pick someone else.

Including lots of photos increased the denominator, and reduced the chances of picking any particular person. The higher the number of photos, the lower the chance that any one photo would be selected. Mims was *better* off because the array had more photos, not worse off. *See Phillips*, 743 F. Supp. 2d at 944. If you were in the lineup, and you could choose between 5 other people or 15 other people being in the lineup with you, it wouldn't be a close call.

To be sure, Mims contends that the officers initially showed McKee a single photo. That's known as a "showup." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 192).

The Seventh Circuit has cautioned that showups are particularly suggestive. *See United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007); *United States v. Newman*, 144 F.3d 531, 535 (7th Cir. 1998). Still, "showups are proper and not unduly suggestive under certain circumstances." *Armstrong v. Young*, 34 F.3d 421, 427 (7th Cir. 1994) (citations omitted).

A showup is less suggestive when the witness is already acquainted with the suspect. *See United States ex rel. Sanders v. Detella*, 814 F. Supp. 690, 696 (N.D. Ill. 1993). It doesn't plant a seed when the seed is already familiar.

Here, the police did not show McKee a picture of a complete stranger. They did not create an indelible mental image of someone that McKee had never seen before. Instead, the police showed her a picture of Mims – someone who she already knew. McKee already had familiarity with Mims, which reduced the risk of suggestiveness. The fact that the officers showed McKee a single picture, in and of itself, is not enough to create a genuine issue of material fact.

### B.    Reliability of the Identifications

The photo array cannot give rise to a claim for another reason. The photo array was sufficiently reliable. *See Manson*, 432 U.S. at 113–14.

Both McKee and Fields recognized the shooter and had seen him before (but Fields didn't know his name). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 17, 38 (Dckt. No. 192). They had ample opportunity to observe the shooter before the identification. *See Biggers*, 409 U.S. at 199–200. And McKee and Fields have never testified that officers influenced their identifications. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 94 (Dckt. No. 192).

McKee told the police that she had known the shooter for two years, as someone by the name of "Bern." *Id.* at ¶ 38. Mims disputes that he was known by the nickname "Bern." But his first name is "Bernard." He had a tattoo reading "Burn." His arrest record said his nickname was "Berny." *Id.* at ¶ 42. Crafton identified Mims as "Bern," too. *Id.* at ¶ 52.

No evidence suggests that McKee or Fields were tricked into choosing Mims's photo. In fact, the evidence suggests that it would have been difficult for the police to trick them into picking Mims. After all, they knew Mims, and had seen him before.

Indeed, even if the procedures were unduly suggestive, the identifications were *reliable* because McKee and Fields already knew the shooter. McKee and Fields weren't identifying

someone they only got a quick glimpse of mid-shooting. They were identifying someone who they had seen on multiple occasions.

McKee and Fields stood by their IDs, too. Twice, they identified Mims as the shooter when they stood on the witness stand (before the grand jury and at trial). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 49, 61, 82–83 (Dckt. No. 192). So, even if the photo array was impermissibly suggestive, the totality of circumstances made it sufficiently reliable for admission. *See Brathwaite*, 432 U.S. at 113–14.

Importantly, the question about the suggestive nature of the identifications by Fields and McKee is not new. Judge Toomin ruled on whether to suppress the identifications by McKee and Fields on the grounds that identification procedures and photo arrays were unduly suggestive. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 76–79 (Dckt. No. 192). After hearing the objections, Judge Toomin believed that the identifications were sufficiently reliable.

Mims (correctly) points out that Judge Toomin's ruling on the motion to suppress has no preclusive effect given that his conviction was vacated. *See* Pl.'s Resp., at 11 (Dckt. No. 184); *see also* Defs.' Reply, at 10 (Dckt. No. 200) ("Mims is correct that the ruling by Judge Toomin does not collaterally estop Mims's claim[.]").

While not legally binding on this Court, Judge Toomin's boots-on-the-ground ruling has probative value. Judge Toomin considered whether to suppress the identifications on multiple occasions. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 76–79 (Dckt. No. 192). He held a hearing in November 2005. *Id.* And he allowed Franks (again, defense counsel) to reopen the motion in February 2006, right before Mims's trial began, so that another witness (Officer Przepiora) could testify. *Id.*

Franks identified the same flaws with the photo array then that Mims raises now.

30

**A30**

In February 2006, Franks argued that McKee was initially shown a single photograph of Mims, and later shown the array with eleven photos. *See* 2/16/06 Tr., at 43:6 – 46:16 (Dckt. No. 180-8). Franks also argued that the eleven images were unduly suggestive because each one showed a Black Disciple, and that only four or five photos should have been used. *Id.* at 49:15 – 50:4. Franks argued that the other individuals pictured didn't resemble Mims, too. *Id.* at 50:16-20.

Judge Toomin heard those arguments and rejected all of them. *Id.* at 52:12 – 53:10. Basically, Judge Toomin thought about whether the photo identifications by McKee and Fields were unduly suggestive and should be suppressed. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 76–79 (Dckt. No. 192). Judge Toomin gave Mims multiple opportunities to call witnesses and make arguments about inadmissibility of the identifications by McKee and Fields, and concluded they were sufficiently reliable. Judge Toomin had the chance to assess the reliability of McKee and Fields when they took the witness stand, too. *Id.* at ¶¶ 82–83.

This Court is not compelled to land in the same place as Judge Toomin. But after reviewing the evidence, this Court agrees. The photo array was not unduly suggestive, and even if it was unduly suggestive, it was sufficiently reliable for admission.

### C. Knowledge of Falsity

Another hurdle remains, and it is tall. For a fabrication of evidence claim, Mims must show that Defendants knew, "with certainty," that the evidence was false. *See Coleman*, 925 F.3d at 344. It is not enough to give reasons why Defendants had reason to doubt the evidence. *Id.* at 345. The epistemological bar is high – a claim requires certainty, not a reason to doubt.

At best, Mims offered evidence suggesting that Officer Przepiora may not have used the accepted procedures for putting together a photo array. *See* Defs.' Resp. to Pl.'s Statement of

Facts, at ¶ 13 (Dckt. No. 197). For instance, Przepiora may have used more photos in the array than he had been trained to use. That evidence falls far short of suggesting that Przepiora *knowingly* got McKee and Fields to falsely identify Mims.

Indeed, McKee and Fields have never alleged that any police officer influenced them to pick Mims. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 94 (Dckt. No. 192). And if Przepiora used *more* photos than he should have, Mims was *less* likely to get picked.

Simply put, there is no evidence – direct or circumstantial – that would allow a reasonable jury to find that Officer Przepiora planned to have McKee or Fields falsely identify Mims, and knew that the evidence was false. Mims cannot show, as a matter of law, that Przepiora (or any other officer) knowingly fabricated evidence.

The section of Mims's brief opposing summary judgment on Count II focuses almost entirely on the identifications by McKee and Fields. But in one paragraph, Mims argues that "there is strong evidence that [Officers Przepiora and McDermott] (working as a 'team') purposefully hid evidence that would have revealed that there was a conspiracy between Demetrius Milon, Lithia Henderson, Tashundra Crafton, Thomasina McKee and Wallace Fields to frame Mims for Baker's murder." *See* Pl.'s Resp., at 7 (Dckt. No. 184). Mims alleges that Officers Przepiora and McDermott "knowingly destroyed notes . . . or failed to document interviews, hid how McKee came to their attention, hid evidence that they interviewed Henderson and Milon, and used manipulative and deceptive police procedures to obtain a conviction that they knew to be false." *Id.*

As a threshold matter, many of these arguments seem more like destruction of evidence arguments. Yet, Mims is not pursuing a claim against Officers Przepiora or McDermott for destroying notes or information about interviews.

In support of his theory that Milon, Henderson, Crafton, McKee, and Fields conspired to frame him, Mims provides citations to his Rule 56 statement, and to his response to Defendants' Rule 56 statement. But the cited facts don't support a fabrication of evidence claim.

For instance, paragraph 3 of Mims's own statement (presumably cited to support the notion that the officers hid evidence about interviewing Milon) does not show that officers ever interviewed Milon at all. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 3 (Dckt. No. 197).

In another example, Mims points out that Officer McNally could not recall whether he took notes at his interview with Richardson (where Richardson told McNally that Sardin, Chester, and McNeil murdered Baker). *Id.* at ¶ 21. However, McNally prepared a sworn affidavit about the consensual overheard. *Id.* McNally testified that everything that Richardson told him was included in that affidavit. *Id.* And that affidavit was used to obtain a court order to record conversations between McNally and Sardin. *Id.* So, the evidence does not suggest that McNally ignored evidence about the involvement of Sardin, Chester, or McNeil to frame Baker.

"Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.,* 612 F.3d 932, 937 (7th Cir. 2010). "[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Carmody v. Bd. of Tr. of Univ. of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018).

At bottom, Mims's argument that there was a conspiracy between Milon, Henderson, Crafton, McKee, and Fields to frame him for the Baker murder is pure conjecture. The allegations are too speculative to survive summary judgment.

In sum, this Court concludes that no reasonable jury could find in favor of Mims on Count II. There is no evidence in the record to support a conclusion that the police knowingly fabricated evidence through the identification tactics they used. Count II is dismissed.

**A33**

### III.     Qualified Immunity

Defendants argue that they are "entitled to qualified immunity on all of Plaintiff's Constitutional claims because their conduct did not violate clearly established law."  *See* Mtn. for Summ. J., at 3 (Dckt. No. 173).

The Court is dismissing all of Mims's claims on the merits.  So strictly speaking, the Court does not need to reach the issue of qualified immunity.  Nonetheless, in the interest of completeness, the Court will briefly address qualified immunity.

Qualified immunity is a "doctrine designed to protect public officials from the effects of guessing wrong in a world of legal uncertainty."  *See Anderson v. Cornejo*, 355 F.3d 1021, 1022 (7th Cir. 2004).  "Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known."  *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 572 (7th Cir. 2014).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).  Instead, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  But "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question."  *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (citations omitted).

Qualified immunity is a burden-flipping affirmative defense.  "Qualified immunity is an affirmative defense, but once the defendant raises it, 'the burden shifts to the plaintiff to defeat it.'"  *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021); *Abbott v. Sangamon County*,

**A34**

705 F.3d 706, 723 (7th Cir. 2013) ("Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it.").

The Court will consider the issue of qualified immunity for the concealment of evidence claim, and then the fabrication of evidence claim.

### A.      Concealment of Evidence

According to Mims, the officers should not receive qualified immunity on the *Brady* claim because "[i]t has been clearly established for decades that police officers must disclose exculpatory evidence." *See* Pl.'s Resp., at 12 (Dckt. No. 184).

That's true:  case law pre-dating 2000 establishes that officers must disclose exculpatory evidence to the prosecution. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 280 (1999).  But that's a stratospherically high level of generality, almost leaving the atmosphere. *See Kisela*, 138 S. Ct. 1148.  It's just shy of the orbit of "due process."

Even so, Mims's theory is that the *prosecution* failed to turn over evidence to his attorney. *See* Pl.'s Resp., at 11 (Dckt. No. 184).  And that evidence – the recordings – was impounded by the court. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 192). Judge Toomin ordered that the recordings be turned over to defense counsel, too. *Id.* at ¶ 74.

The officers had an obligation to disclose exculpatory evidence to the prosecution.  But the officers did not have an obligation to ensure that court-impounded materials – to which the prosecution had access – actually made it into the hands of defense counsel.

In short, no clearly established law required the officers to do any more with the recordings than what they did.  They gave the recording to the prosecutors, and the prosecutors gave the recordings to the trial court.  Therefore, the officers are entitled to qualified immunity on Mims's *Brady* claim.

35

**A35**

**B.       Fabrication of Evidence**

Mims contends that "it has been clearly established since long before 2000" that officers violate due process by using unduly suggestive identification practices or fabricating evidence. *See* Pl.'s Resp., at 13 (Dckt. No. 184).

Defendants disagree.  They argue that "no legal authority exists now, much less in 2001, 2002, 2003, or 2004" to support Mims's fabrication of evidence claim.  *See* Defs.' Reply, at 12 (Dckt. No. 200).

Use of impermissibly suggestive photographic evidence violates a defendant's Fourteenth Amendment due process right if it creates a "very substantial" likelihood of "irreparable" misrepresentation.  *See, e.g.*, *Simmons v. United States*, 390 U.S. 377, 384 (1968) (holding that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"); *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (opining that a suggestive out-of-court identification that creates a "very substantial likelihood of irreparable misidentification" violates a defendant's due process right); *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (noting that photographic identifications can violate due process depending on the likelihood of irreparable misidentification).

Mims argues that the photo array was intentionally designed to suggest to witnesses that they should pick Mims's photo.  *See* Pl.'s Resp., at 7 (Dckt. No. 184) (asserting that Defendant Officer Przepiora "design[ed] an identification procedure . . . that he knew would result in McKee selecting Mims.").

36

**A36**

But Mims's contention is not borne out by the facts. Use of photographic evidence is common practice. The use of a suggestive photo array would violate clearly established law only if it created an irreparable likelihood of misidentification. *See Simmons*, 390 U.S. at 384.

Both witnesses who viewed the photo array (McKee and Fields) had seen Mims before. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 17, 38 (Dckt. No. 192). So, the risk of misidentification was limited. The risk was low even if Officer Przepiora broke from best policing practices when choosing the photos to include in the array, and even if McKee was shown only a single photograph.

Given the case law at the time of the interviews, a reasonable officer would not have known that they violated clearly established law when they showed the photos to McKee and Fields.

Again, qualified immunity is a burden-flipping defense. Once Defendants raised it, Mims had the burden to show why qualified immunity should not apply. *See Taylor*, 10 F.4th at 806. But Mims "point[s] to no controlling or persuasive authority that clearly established that it was impermissible for the police to use a photo array" like this one. *See Holloway v. City of Milwaukee*, 43 F.4th 760, 767 (7th Cir. 2022), *cert. denied sub nom. Holloway v. City of Milwaukee*, 143 S. Ct. 1083 (2023). So "defendants are entitled to qualified immunity as a matter of law." *Id.*

The Court therefore agrees that Defendants are entitled to qualified immunity on the fabrication of evidence claim (Count II).

## IV. Indemnification (Count VIII)

Count VIII seeks indemnification from the City of Chicago for the actions by the Officer Defendants. *See* Cplt., at ¶¶ 220–22 (Dckt. No. 1).

**A37**

But the Court is granting summary judgment to the Officer Defendants on every claim left in this case.  So, there is nothing to indemnify.

The Court therefore grants summary judgment to the City of Chicago on Count VIII.

## V.     *Respondeat Superior* (Count IX)

Count IX seeks to hold the City of Chicago liable for the torts committed by the Officer Defendants under the doctrine of *respondeat superior*.  *See* Cplt., at ¶¶ 223–25 (Dckt. No. 1).

Under Illinois common law, an employer "may be held vicariously liable for the tort of an employee if the tort is committed within the scope of the employment."  *See Richards v. U.S. Steel*, 869 F.3d 557, 565 (7th Cir. 2017) (citation omitted); *see also Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 991 (Ill. 2007).

But here, the Court is granting summary judgment to the Officer Defendants on all remaining counts.  The Court did not conclude that the Officer Defendants committed any torts against Mims – in the scope of their employment or otherwise.  So, the City of Chicago cannot be held liable under the doctrine of *respondeat superior*.

Therefore, the Court grants summary judgment to the City of Chicago on Count IX.

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted.

Date:  March 12, 2024

_____
Steven C. Seeger
United States District Judge

38

**A38**

ILND 450 (Rev. 10/13) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BERNARD MIMS,

    Plaintiff(s),

v.

CITY OF CHICAGO, et al.,

    Respondent(s).

Case No. 18-cv-7192
Hon. Steven C. Seeger

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $    ,

        which ☐ includes    pre–judgment interest.
            ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.
Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒    other:  The Court enters judgment in favor of defendants City of Chicago, Officer Kenneth Boudreau, Officer Michael McDermott, Officer Daniel McNally, Officer Robert Montgomery, Officer Richard Peck, Officer Ted Przepiora, and against plaintiff Bernard Mims. Civil case terminated.

---

This action was *(check one)*:

☐ tried by a jury with Judge    presiding, and the jury has rendered a verdict.
☐ tried by Judge    without a jury and the above decision was reached.
☒ decided by Judge Steven C. Seeger on defendants' motion for summary judgment. (Dckt. No. [173])

Date:  3/12/2024              Thomas G. Bruton, Clerk of Court

                                      Jessica J. Ramos, Deputy Clerk

**A39**

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BERNARD MIMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-7192 |
| | ) | |
| THE CITY OF CHICAGO, KENNETH | ) | Judge Steven Seeger |
| BOUDREAU, RICHARD PECK, ROBERT | ) | |
| MONTGOMERY, DANIEL MCNALLY, TED | ) | |
| PRZEPIORA, MICHAEL MCDERMOTT, | ) | |
| RAYMOND KAMINSKI, | ) | |
| | ) | |
| Defendants. | | |

## **NOTICE OF APPEAL**

Notice is hereby given that Plaintiff Bernard Mims in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the judgment entered in this action on March 12, 2024 (Dkt. 212), and the memorandum opinion and order entered in this action on March 12, 2024 (Dkt. 211), which granted summary judgment in favor of the defendants in this case.

Respectfully Submitted,

s/ Jon Loevy
*One of Plaintiff's Attorneys*

Jon Loevy
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900

Jennifer Blagg
Blagg Law
1333 W. Devon Ave., Suite 267
Chicago, IL 60660
(773) 859-0081

**A40**

## <u>CERTIFICATE OF SERVICE</u>

I, Jon Loevy, an attorney, hereby certify that I served the foregoing on all parties of record via the Court's CM/ECF e-filing system on April 8, 2024.

s/ Jon Loevy

**A41**

ILND 450 (Rev. 10/13) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BERNARD MIMS,

    Plaintiff(s),

v.

CITY OF CHICAGO, et al.,

    Respondent(s).

Case No. 18-cv-7192
Hon. Steven C. Seeger

## AMENDED JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $    ,

        which ☐ includes    pre–judgment interest.
        ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment. Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒    other:  The Court enters judgment in favor of defendants City of Chicago, Officer Kenneth Boudreau, Officer Michael McDermott, Officer Daniel McNally, Officer Robert Montgomery, Officer Richard Peck, Officer Ted Przepiora, Officer Raymond Kaminski, and against plaintiff Bernard Mims.  Defendant Officers Jean Romic and John Clisham are dismissed without prejudice in light of the filing of the stipulation of dismissal under Rule 41(a)(1)(A)(ii).  Civil case terminated.

---

This action was (check one):

☐ tried by a jury with Judge    presiding, and the jury has rendered a verdict.
☐ tried by Judge    without a jury and the above decision was reached.
☒ decided by Judge Steven C. Seeger on defendants' motion for summary judgment. (Dckt. No. [173])

Date:  5/8/2024             Thomas G. Bruton, Clerk of Court

                                  Jessica J. Ramos, Deputy Clerk

**A42**